## RHODE ISLAND LOCOMOTIVE WORKS v. CONTINENTAL TRUST CO.

### (Circuit Court of Appeals, Sixth Circuit. November 7, 1900.)

### No. 788.

**1. RAILROADS—FORECLOSURE PROCEEDINGS—PREFERENTIAL DEBTS.**

To entitle a general unsecured creditor of an insolvent railroad company, whose property has been placed in the hands of a receiver in foreclosure proceedings, to preferential payment over the mortgage creditors, it must be shown: First, that the demand is not a debt created upon the personal credit of the company, but a current operating expense incurred to maintain its property as a going concern and its railroad in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company; and, second, that there are net or current earnings in the hands of the receiver applicable to the payment of such debts of the income, or that there has been a diversion of the current earnings, either before or since the receivership, which the mortgagees should equitably restore.

**2. SAME—DEBTS OF INCOME—PURCHASE OF LOCOMOTIVES.**

Intervener sold to defendant railroad company 12 locomotives, through a third party, who paid 80 per cent. of the price, and took absolute title, transferring the locomotives to the company under lease contracts. For the remaining 20 per cent. of the price intervener took a series of notes of the company, indorsed by one of its stockholders, payable monthly, and extending over a number of months. Subsequently the railroad passed into the hands of a receiver in foreclosure proceedings. It did not appear that the engines were necessary to maintain the road as a going concern, or to its safe operation, but they were needed to enlarge its capacity to handle its traffic. Neither was it shown that any of the current income of the company had been diverted to other uses than the payment of current expenses, nor that there were any net earnings in the hands of the receiver. *Held,* that such facts were insufficient to establish the debt as a necessary current expense, or that it was contracted in reliance on its payment from current earnings so as to entitle intervener to preferential payment over the mortgages, even if there had been net earnings of the receivership; and that the absence of such fund and proof of diversion of earnings were additional grounds for refusing the claim preferential payment from the proceeds of the corpus of the property.

**3. APPEAL—ASSIGNMENTS OF ERROR.**

Under rule 11 of the circuit court of appeals for the Sixth circuit (31 C. C. A. cxlvi., 91 Fed. cxlvi.), requiring assignments of error to "set out separately and particularly each error asserted and intended to be urged," an assignment that a circuit court erred in overruling "each and every of the several exceptions" of the appellant to the report of a master, none of which are set out in the assignment, is insufficient to entitle appellant to a review of the ruling upon any one of such exceptions.

Appeal from the Circuit Court of the United States for the Western Division of the Northern District of Ohio.

The appellant is a creditor of the Toledo, St. Louis & Kansas City Railroad Company, and its debt is evidenced by the promissory notes of the company executed in part payment for certain locomotives purchased by it. In May, 1893, upon the application of certain judgment creditors, by bill filed in the circuit court, a receiver was appointed, who took possession of the entire property of the railroad company, and from then until its final sale its railroad has been operated under the orders of the court. In December, 1893, a mortgage foreclosure bill was filed in the same court by the trustees under a first mortgage made by the company. The two suits were consolidated under the title of the latter, and the receivership extended to both suits. The appellant filed an intervening petition in the consolidated cause, praying that its said claim might be paid "by the receiver out of the property, income, and earnings

of said railroad, and that its debt be declared a lien and charge upon the property of said railroad, or proceeds thereof, or income therefrom, prior and superior to that of the mortgagees." The petition was answered by the Continental Trust Company, the trustee for the bondholders, and all the equities of the intervener denied. The issues thus presented were referred to Irvin Belford, as special master, with directions to report his findings of fact and law. The master, among other things, reported that in September, 1892, the railroad company purchased from the Rhode Island Locomotive Works five locomotives, through an arrangement with the New York Equipment Company, whereby the latter corporation paid 80 per cent. of the purchase price for the railroad company to the vendor, and took an absolute title; the railroad company agreeing to pay to the vendor the remaining 20 per cent. In pursuance of this plan the equipment company, under date of January 6, 1893, entered into a contract nominally leasing these engines to the railroad company for the term of 72 months for the consideration of $12,770 in cash upon delivery and 72 monthly installments of $909.22, running February 23, 1893, to January 23, 1899, inclusive; the property to become the property of the railroad company without further conveyance upon the payments being completed. Provisions were inserted common to such transactions touching the care and preservation of the property, and providing for the contingency of default in payment. Plates were affixed to each locomotive reciting that it was the property of the equipment company. For that part of the purchase price which the railroad company undertook to pay directly to the vendor, the latter agreed to take the promissory notes of the purchaser, indorsed by S. H. Kneeland, who was a large stockholder in the railroad company. Accordingly, eight notes, each for $1,141.25, were executed, due, respectively, on the 22d of each month, from November, 1892, to June, 1893, inclusive. In January, 1893, seven other locomotives were purchased under an identical arrangement, and for the 20 per cent. of the price to be paid by the company another series of notes was executed, and indorsed by S. H. Kneeland. The company paid of the first series of notes the first five, and of the second series those maturing in February and March, 1893. Renewal notes were made for the notes of the first series maturing April 22, 1892, and for the notes of the second series maturing in April and May, 1893, which renewals were also indorsed by S. H. Kneeland, and further secured by the pledge of four gold debenture bonds of the company for $1,000 each. There is now due of the principal sum of the first series of notes $3,423.75, and of the principal sum of the second series $10,641.68, together with interest. He further reported that the railroad company was in great need of additional locomotive equipment to handle its traffic, and that the receiver had paid, by direction of the court, the balance due to the equipment company under its contracts with the railroad company. He also reported that there was no agreement that that part of the price to be paid by the railroad company to the Rhode Island Locomotive Works should constitute any lien upon the locomotives, and that there had been no evidence offered "to show that there had been any diversion of current earnings to the payment of interest or to the purchasing of equipment or the making of permanent improvements,"`and that there had been no delay by the bondholders in the assertion of their lien under the mortgage, after default. As a conclusion of law, he reported that the intervener was an unsecured creditor entitled to no preference over the mortgagees. Exceptions to this report were filed, and overruled by Circuit Judge Taft, the report confirmed, and the petition dismissed so far as it sought to enforce any lien or secure any preference over the mortgagees. From this decree the Rhode Island Locomotive Works has appealed and assigned errors.

E. D. Potter and Thomas Emery, for appellant.

Edwin T. Rice, Jr. (E. C. Henderson, of counsel), for appellee.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

The attitude of the appellant as a general unsecured creditor of

the railroad company is admitted.   That any special lien exists upon the locomotives for the security of this part of the purchase price is not now contended.   If the appellant is to obtain any relief, it must show:   First, that the demand here presented is not a debt created upon the personal credit of the company, but a current operating expense incurred to maintain the property as a going concern, and its railroad in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company; and, second, that there are net or current earnings now applicable to the payment of such debts of the income, or that there has been a diversion of the current earnings, either before or since the receivership, which the mortgagees should equitably restore.   International Trust Co. v. T. B. Townsend Brick & Contracting Co., 37 C. C. A. 396, 95 Fed. 850; Central Trust Co. v. East Tennessee, V. & G. R. Co., 26 C. C. A. 30, 80 Fed. 624; Virginia & A. Coal Co. v. Central R. & Banking Co., 170 U. S. 365, 18 Sup. Ct. 657, 42 L. Ed. 1068; Southern Ry. Co. v. Carnegie Steel Co., 176 U. S. 257, 285, 20 Sup. Ct. 347, 44 L. Ed. 458.   The acquisition of additional motive power was the addition of permanent equipment, and it is not shown that such additional equipment was at all necessary to maintain the railroad as a going concern, or necessary "to keep the railroad itself in condition to be used in reasonable safety for the transportation of persons and property," as was found to be the case in Southern Ry. Co. v. Carnegie Steel Co., cited above, where a debt for steel rails was held to be a preferential debt.   The most that can be said to justify so large a purchase of additional equipment is that it was necessary to the enlargement of the capacity of the railroad company to conduct its traffic.   That such a great investment in permanent equipment was not deemed an ordinary current operating expense would seem to have been recognized by the circumstances of the transaction.   The Rhode Island Locomotive Works contracted that 80 per cent. of the sale price should be paid to it by the New York Equipment Company, and the equipment company secured itself for the advance by taking and retaining the title until this advance should be repaid.   To the extent that the vendor gave credit to the railroad company, it took care that there should not be reliance upon current earnings as a fund to meet the obligation, but that S. H. Kneeland should indorse the company's notes, and thus stand as a security to it.   That by these notes the sum payable was distributed through a number of monthly payments is, of course, a circumstance to be considered in determining whether the debt was one contracted upon the expectation that it would be met out of current earnings, but it is not sufficient, in view of all of the circumstances connected with this transaction.   We concur, therefore, with Circuit Judge Taft in his conclusion that this demand is not one of that limited class of debts called "debts of the income," and was not one of the class of debts included in the equity or letter of the order made with respect to debts properly payable out of the income of the receivership.   In Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, and in Kneeland v. Trust Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379, and

in Thomas v. Car Co., 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663, debts for the rental of cars were held not to be preferential debts. In Huidekoper v. Locomotive Works, 99 U. S. 258, 25 L. Ed. 344, a debt due as part of the purchase price of locomotives purchased, the vendor retaining the title as security, was held not to be an equitable claim upon the income of the receivership, but a general unsecured debt. That the equipment purchased added to the earning power of the railroad company, and has augmented the security held by the mortgagees, is an element to be considered in passing upon the claim; but this fact has never been regarded as in itself justifying the displacement of an antecedent mortgage. International Trust Co. v. T. B. Townsend Brick & Contracting Co., 37 C. C. A. 396, 409, 95 Fed. 850, where the cases are collected and reviewed. In Southern Ry. Co. v. Carnegie Steel Co. the supreme court took care to avoid throwing doubt upon the earlier adjudications of that court by saying:

"We must not be understood as saying that a general, unsecured creditor of an insolvent railroad corporation in the hands of a receiver is entitled to priority over mortgage creditors in the distribution of net earnings simply because that which he furnished to the company prior to the appointment of the receiver was for the preservation of the property and for the benefit of the mortgage securities. That, no doubt, is an important element in the matter. Before, however, such a creditor is accorded a preference over mortgage creditors in the distribution of net earnings in the hands of a receiver of a railroad company, it should reasonably appear from all the circumstances, including the amount involved and the terms of payment, that the debt was one fairly to be regarded as part of the operating expenses of the railroad incurred in the ordinary course of business, and to be met out of current receipts."

The same conclusion might be reached upon the ground that it does not appear that there are any funds growing out of the receivership which remain to be applied to debts of the income or upon the mortgage debt. Fosdick v. Schall, 99 U. S. 235, 254, 25 L. Ed. 339. If the demand of the appellant is to be paid at all, it must be paid out of the proceeds of the sale of the mortgaged property of the railroad company at the expense of the mortgagees. But before this can be done it must be made to appear that there has been a diversion of current earnings, by which this complainant has been deprived of his equitable rights, and that the mortgagees should equitably restore to the fund liable to the payment of debts of the income the fund thus diverted. In International Trust Co. v. T. B. Townsend Brick & Contracting Co., cited above, we had occasion to consider the circumstances under which the proceeds of the corpus of a mortgaged railroad might be applied to the payment of an unsecured creditor in preference to the mortgagee, and said:

"But, if there has been no diversion of the current income, either before or after the appointment of a receiver, and no 'surplus income' during the receivership, out of which unpaid debts of the income can be paid, upon what theory can the proceeds of a mortgage foreclosure sale be applied to the payment of such debts against the objection of mortgage creditors? If nothing has been diverted from the 'current debt fund,' if there has been no augmentation of the fund applicable primarily to the satisfaction of the mortgage creditors, is there any just or equitable reason for requiring a restoration where nothing has been improperly received? We think in such cases the court has no power to displace contract rights, and neither Fosdick v. Schall nor any of the cases

which have followed it afford any sufficient authority, when rightly under-stood, in opposition to this view. These 'debts of the income' are an 'equi-table charge' only upon the 'current income' of the mortgaged railroad. If such debts remain unpaid when the railroad passes into the possession of a court of equity, this 'equitable charge' is continued, and attaches to the 'surplus income' arising under the receivership. If this surplus income is not applied to the payment of the debts to which it is primarily devoted, but is expended for the benefit of the mortgagee, as in payment of interest, or in the purchase of property which passes under the mortgage, or in betterments of the railroad itself. an equity arises, as a consequence of such diversion, which will justify a court of equity in requiring the mortgagees to restore to the income that which has been taken away. The power of the court to displace mortgage liens in favor of such unsecured debts of the mortgagor depends upon the fact that the current income, either before or after the receivership, has been diverted to the benefit of the displaced mortgage; and the extent to which the corpus of the mortgaged property can be called upon to pay such debts of the income is limited by the amount of the diversion."

There is nothing in Southern Ry. Co. v. Carnegie Steel Co., cited heretofore, which casts any doubt upon this restoration doctrine as declared in Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, Burnham v. Bowen, 111 U. S. 776, 783, 4 Sup. Ct. 675, 28 L. Ed. 596, and in St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U. S. 658, 673, 8 Sup. Ct. 1011, 31 L. Ed. 832. Upon the contrary, the decree in that case was predicated upon the fact that there had been a di-version of income "in paying interest, sinking fund, and contract debts, and for construction and equipment, which were all for the benefit of mortgage creditors, and which, to the extent necessary, should have been applied in payment of preferential claims, includ-ing those of the Carnegie Company." 176 U. S. 294, 295, 20 Sup. Ct. 362, 44 L. Ed. 474.

The special master, who was directed to take proof and report, his finding of facts, reported, among other things, "that no testimony had been offered to show that there has been any diversion of current earnings to the payment of interest, or to the purchasing of equip-ment, or the making of permanent improvements." An exception to this finding was overruled by the circuit judge. The only assign-ment of error which bears upon this finding of fact is the first, which is in these words:

"(1) The said circuit court erred in overruling each and every of the several exceptions of the said intervener to the finding and report of the special mas-ter. and in approving and confirming the said special master's findings and report."

Rule 11 of the rules of this court (31 C. C. A. cxlvi., 91 Fed. cxlvi.) requires that the assignment of errors "shall set out separately and particularly each error asserted and intended to be urged." Nine separate exceptions were filed to the report of the master. The as-signment is bad as including nine separate exceptions in one assign-ment, none of which are set out in the assignment itself. This find-ing of facts constitutes, therefore, the facts upon which the decree below was founded, and upon which this court must affirm or dis-affirm that decree. It follows that, if there was no diversion of in-come by which the mortgagees have benefited, which was applicable to the payment of the demand of the appellant, there is no basis for

any decree giving appellant precedence in the distribution of the proceeds of the sale of the mortgaged property. The decree must be affirmed.