GREGG v. MERCANTILE TRUST CO. et al. ADAMS & WESTLAKE CO.
v. SAME. COLUMBUS TERMINAL & TRANSFER R. CO. v. SAME.
HARRISON et al. v. SAME. STEWART v. SAME. LOUISVILLE
& N. R. CO. v. SAME. BALTIMORE & O. S. W. R.
CO. v. SAME.

(Circuit Court of Appeals, Sixth Circuit. May 7, 1901.)

Nos. 858, 868, 865, 866, 875, 877, 876.

1. RAILROADS—FORECLOSURE PROCEEDINGS—PREFERENTIAL DEBTS.

Claims against a railroad company for the price of cross-ties essential
to the replacement of ties decayed, and of small quantities of hardware,
both needed and used in the usual and ordinary operation of the road,
as well as for traffic balances due to other roads on current account,
are all within the class of current operating expenses, which may prop-
erly be given a preference in payment from the net earnings of the
road under a receivership in foreclosure proceedings, where the claims
accrued within six months prior to the receivership, and are within the
terms of a general order requiring the receiver to pay claims for services,
materials, and supplies accruing within that time.

2. SAME—RENTAL OF TERMINALS.

Claims against a railroad company for the rental of terminal facilities
accruing under a perpetual lease which reserves to the lessor the right
to terminate it and retake possession of the property, with all additions
and improvements made thereon by the lessee, in case of default in
payment of rentals for 30 days, are not debts of the income, entitled
to preference of payment over mortgage debts from the earnings of the
road.

3. SAME—PURCHASE OF LOCOMOTIVES.

A debt incurred by a railroad company for locomotives acquired to
give it additional motive power is not one which is entitled to preference
over mortgage debts merely because the locomotives, when acquired,
passed under the mortgage, and added to the security of the mort-
gagees. While that is a fact to be considered, it does not alone warrant
a displacement of the mortgage lien, but it must further appear that
the acquisition was reasonably necessary to the usual operation of the
road.

4. SAME—CLAIMS FOR LEGAL SERVICES.

Claims for legal services rendered a railroad company in the ordinary
course of its business under special employment, which do not directly
contribute in some way to the advantage of the mortgagees, do not
stand upon a plane with the labor of operatives, or the claims of those
who furnish materials or supplies to maintain the road as a going con-
cern in respect to the right of preference over the mortgage debt.

5. SAME—PROCEEDS OF CORPUS OF PROPERTY—GROUNDS FOR DISPLACING MORT-
GAGE LIEN.

A mortgage upon the corpus of the property of a railroad company
can only be displaced in favor of later general creditors on the ground
and to the extent that there has been a diversion of current income by
the company or a receiver, by which the mortgagees have profited, and
from which income such general creditors had a prior equitable right to
payment.

6. SAME—DIVERSION OF INCOME—PAYMENT FOR EQUIPMENT.

Payment by a railroad company, or by its receiver, from the current
earnings of the road, of trust certificates issued for cars or equipment
purchased, which was not necessary to keep the road a going concern,
and which certificates did not, therefore, create a debt of the income,
is a diversion of such earnings inuring to the benefit of the mortgagees,
under whose mortgage the equipment passed, subject to the lien of the
vendor; and unsecured creditors having preferential claims against the

income are entitled to have the amounts so diverted restored from the proceeds of the corpus of the property when sold in foreclosure proceedings.

Appeals from the Circuit Court of the United States for the Southern District of Ohio.

These seven appeals have been heard together. The appellants are all general creditors of the Columbus, Sandusky & Hocking Railroad Company, whose claims have been duly established, but who appeal because they have not been allowed a preference over the mortgage debts of said railroad company in the proceeds of the sale of the mortgaged railroad property. The property of the railroad company is subject to two mortgages securing issues of bonds aggregating some $11,000,000, and the property mortgaged is confessedly insufficient to pay these mortgage debts. These mortgages are in course of foreclosure in two consolidated causes under the style of "The Metropolitan Trust Co. v. The Columbus, Sandusky & Hocking Railroad Company." The first of these foreclosure bills was filed June 2, 1897, the complainant being the Mercantile Trust Company, trustee under the first of the two mortgages mentioned. Under that bill, and on the day of its filing, S. M. Felton was appointed receiver by an order which, among other things, provided that he should "pay the employés, officials, and other persons having claims for wages, services, materials, and supplies due and to become due, and unpaid, growing out of the operation of the railroad of the defendant, including current and unpaid vouchers; and for such purpose, as well as for the purpose of meeting the obligation of the pay rolls, said receiver is hereby authorized in his discretion to borrow such sums of money as may be necessary for such purpose, not exceeding $35,000; but said receiver will pay no claims against the said railroad company which have accrued due more than six months prior to the date of this order." June 7, 1897, the receiver applied for leave to borrow $200,000 upon certificates, stating in his petition that the railroad company, prior to his appointment, had incurred indebtedness "in the maintenance and operation of said railroad, which it is necessary to pay in order to further operate and maintain said railroad in the performance of its duties as a common carrier, etc., and that a part of said indebtedness was for materials and supplies furnished said railroad company, and for obligations necessarily incurred in the maintenance and operation of said railroad during a period of six months preceding the appointment of said receiver herein." He asked authority to issue $200,000 in certificates, to be paid out of the earnings of the railroad, if sufficient, or, if not, then out of the proceeds of the sale of said railroad. An order was made accordingly; the complainant, the trustee under the first mortgage, making no objection to either of the two orders already mentioned. July 7, 1897, the receiver seems to have changed his mind as to the importance of paying off the traffic balances and supply claims due from the railroad company, and accordingly reported to the court that he had borrowed $35,000 under the order made when appointed, and had applied it altogether in the payment of one class of claims directed to be paid, namely, to the payment of the company's pay rolls for April and May, 1897. He asked to have the order of June 7th modified so as to allow him to use the certificates therein ordered as follows: To pay money borrowed to pay April and May pay rolls, 1897, $35,000: to pay a mortgage lien on certain terminal property, $30,000; and that the balance of $135,000 be applied to the payment of "car-trust obligations" and current operating expenses, repairs, etc. The order was accordingly modified. The labor and supply claims proper accrued within six months prior to the order appointing receiver appear to have somewhat exceeded $100,000. None of these claims, except the April and May pay rolls, were paid by the receiver, and there is not now, nor has there ever been, any surplus of receiver's earnings out of which the claims of appellants can be paid. The circuit court appointed a special master, and directed him to hear proof, and report all debts due for labor and supplies furnished within six months which were within the purview of the order of June 2, 1897. The master accordingly reported that the claims of W. S. Gregg, the Adams & Westlake Company, a part of the

claim of the Columbus Terminal Company. the claim of the Louisville & Nashville Railroad Company, and of the Baltimore & Ohio Southwestern Railroad Company were claims which had accrued within six months, and were claims of the character entitled to be paid preferably out of the current income of the railroad company or of the receiver; but that there was no surplus income in the hands of the receiver, and that there had been no diversion of income applicable to such debts by either the company or the receiver. For these reasons he reported that these claims were not entitled to be paid in preference to the mortgagees out of the proceeds of the sale of the corpus of the railroad property. The master reported that the claims preferred by Gilbert H. Stewart and by Harrison, Olds & Henderson were not of a preferential character. The receiver excepted to the master's finding in favor of the preferential character of the claim of the Columbus Terminal Company. This exception was sustained by the circuit court. The terminal company excepted to so much of the master's report as excluded a part of its claim as not being of a preferential character. This exception the court below overruled. Gilbert H. Stewart and Harrison, Olds & Henderson excepted to the report against the preferential character of their claims. These exceptions were sustained by the circuit court. All of the appellants excepted to the report that there had been no diversion of income by the railroad company applicable primarily to the payment of their debts; also to so much of the report as held that appellants were not entitled to be paid out of the corpus of the railroad property in preference to the mortgagees. These exceptions were all overruled, and all of the claims of the appellants disallowed, and their petitions dismissed, so far as they sought payment out of the corpus of the mortgaged property. From these decrees appellants named in the caption have separately perfected appeals and assigned errors.

Harlan Cleveland, W. O. Henderson, and George Hoadly, for six months' creditors.

Paul D. Cravath, for prior lien bonds, general mortgage bonds, and Felton certificates.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

LURTON, Circuit Judge, having made the foregoing statement of the case, delivered the opinion of the court.

1. The claim of W. S. Gregg is for cross-ties essential to the replacement of ties decayed in current operation of the railroad. A large proportion were on hand when the receiver was appointed, and were used by him in the maintenance of the roadway. They were all purchased within six months before the receivership, and under circumstances indicating an expectation that they would be paid for out of current income. The claim is in every respect a highly meritorious one. The claim of the Adams & Westlake Company is for hardware needed in the usual and ordinary daily operation of the railroad. It is for a small amount, and comes clearly within the rule in respect to supply claims proper for ordinary operation of a railroad. The claims of the Louisville & Nashville Railroad Company and of the Baltimore & Ohio Southwestern Railroad Company are for traffic balances in current account between those railroads and the defendant company. These balances accrued within six months, and are such traffic balances as come within the rule of the decided cases, beginning with Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339.

2. The claim of the Columbus Terminal & Transfer Railroad Company consisted of two items. The first of these is for $8,525, and was for rentals accruing within six months under a perpetual lease of

certain tracks and terminal facilities at Columbus, Ohio. The claim arises under a contract between the terminal company and two of the original companies, to whose properties and contracts the defendant railroad company has succeeded. Under that contract the terminal company leased for a term of 99 years, with right of renewal in perpetuity, certain tracks and terminal facilities, the lessee companies agreeing to pay as rental a sum in quarterly payments, in advance, equal to the interest for the next ensuing quarter upon all of the outstanding first mortgage bonds of the terminal company, provided such bonds should not exceed $350,000 in 5 per cent. bonds. The lessee companies also bound themselves to keep the property in repair and pay all taxes, assessments, etc. For failure to pay rent or keep any of the other covenants for a period of 30 days, the lessor might, at its option, resume possession, and declare the lease forfeited, and all interest and estate in the property, including all additions and improvements, terminated. This provision for the protection of the lessor in its rents clearly indicates that the lessor did not rely upon its rentals as constituting an equitable charge upon the current income of the lessee company. The right to enter if for 30 days its rents should be in arrears, and to forfeit the lease, together with all improvements which the lessor company was most likely to make in view of the perpetual character of its term, afforded a most stringent remedy. Aside from this provision for its security, the very character of the claim prevents its inclusion among that class of claims for materials or supplies proper and reasonable for the current maintenance of the railroad as a going concern, in favor of which a special equity exists. The claim is essentially like that disallowed by this court in Louisville & N. R. Co. v. Central Trust Co., 31 C. C. A. 89, 93, 87 Fed. 500, 504. That case, as this, involved the rentals under a lease for a track by which the lessee company reached its station, and certain terminal facilities. Speaking by Judge Severens, this court, among other things, said:

"The nature of the claim is of a kind which, upon the general current of authority upon the subject, disentitles it to a position of priority over the mortgage debt. It appears to us to stand upon no higher or better ground than claims for rentals of rolling stock, which are quite as indispensable to the daily operations of a railroad as are its tracks; and, with respect to track rentals for the period prior to the accession of the receiver, they are not, as a general rule, recognized as entitled to priority. Thomas v. Car Co.. 149 U. S. 95, 13 Sup. Ct. 824, 37 L. Ed. 663."

There was no error in excluding this item from those claims entitled to preference. The second item in this account is for $17,627.45, claimed to be the price of two locomotives sold May 20, 1897, by the terminal company to the railroad company. The only book entry or other writing tending to show the origin of this claim consists in a resolution adopted by the directors of the railroad company under date of May 20, 1897, in these words:

"Resolved, that the Rodgers switching engines, Nos. 53 and 54, now standing in the name of the Columbus Terminal & Transfer Company, be transferred to the account of the Columbus, Sandusky & Hocking Railway Company, and the Columbus Terminal & Transfer Railroad Company receive credit for the same at the price charged them, viz. $17,627.45, these engines

being held by the Columbus Terminal & Transfer Company as collateral to a loan."

On the same day an entry was made upon the books of the railway company, the immediate predecessor of the railroad company, in the title to the property of the railroad company, which was in these words:

"As per resolution of the board of directors under date of May 20, 1897, the two Rodgers switching locomotives, Nos. 53 and 54, which were transferred to the Columbus Terminal & Transfer Railroad Company July 31, 1893, are now taken into cost of property account, and terminal company credited, as these locomotives were held by the terminal company simply as collateral to loan made June 23, 1893, $60,709.16, and so could not hold them, as the title had not been transferred."

It was also in evidence that the railroad company had, through foreclosure sale, acquired the title to the entire property of the railway company and its predecessor companies, and had assumed the floating debts of such predecessor company under a reorganization agreement, the terms and legal effect of which we have considered and determined in the principal case heard upon the same record, and reported as the Columbus, Sandusky & Hocking Railroad Company Appeals, 109 Fed. 177. Upon the whole evidence the master reached the conclusion that the railroad company did not acquire title to these locomotives by a purchase from the terminal company through the foreclosure proceedings mentioned, and had not agreed to pay the terminal company as for a purchase. Upon a re-reference certain affidavits were introduced, tending to show that the terminal company had not held these locomotives as security for a loan, but that it had taken them in 1893 from one of the defendant's predecessor companies at a valuation of $17,627.45, and credited that sum upon an obligation of that company for money loaned, and had taken a bill of sale. These affidavits do not explain how that predecessor company could pass the title to these locomotives, subject, as they were, to the existing mortgages of that company, which mortgage rights have been acquired by the present company through the foreclosure proceedings mentioned. Neither do they explain why the transaction is styled a "transfer," and not a sale, or why they are transferred "to the account of" the railway company, or why the railway company should credit the terminal company with their original valuation. The inference we draw is that the terminal company's title was subject to the mortgages of the old Shawnee & Hocking Company. The railroad company, through its purchase of the property covered by those mortgages, acquired the title of both mortgagor and mortgagees therein. In this situation the credit originally allowed the Shawnee Company was, by consent, revoked so as to allow the terminal company to stand as a creditor for $17,627.45 on the books of the railway company, the successor to the Shawnee Company. The railroad company, having assumed the debts of the railway company, would thus become the paymaster, though only secondarily liable, as we have determined on the same record in the case cited above. This theory accounts for the mysterious entries we have set out. We conclude that the circuit court was right in setting aside the master's supplementary report that the claim represented an out and out sale

to the railroad company, and in confirming his original report that the claim, in effect, was a debt of the railway company, and not a debt incurred in the purchase of property. The relation of the terminal company to both the railway and railroad companies was very intimate. The president of the terminal company was the assistant secretary and assistant treasurer of each of the railroad companies. He is the principal affiant, upon whose evidence the master modified his report. His explaining affidavits do not explain the curious terms of the resolutions and entries we have set out. The whole transaction is shrouded in darkness, unless the deductions we have drawn furnish an explanation. But, upon the assumption that this claim is for the price of two locomotives sold out and out by the terminal company to the railroad company, it is not a debt created for a current operating expense incurred to maintain the railroad as a going concern, or its railroad in condition to be used with reasonable safety for the transportation of persons and property. No evidence was presented to show that the condition or situation of this railroad was such as to make the acquisition of two additional locomotives reasonably necessary to the usual operation of the railroad. The case stands upon the single fact that a railroad company has acquired additional motive power. Some showing that such an addition of this kind to its motive power was essential to enable the company to discharge its ordinary operations as a carrier is necessary to constitute such a claim one for current supplies or materials. This conclusion accords with the opinion of this court in Rhode Island Locomotive Works v. Continental Trust Co. (decided November, 1900) 47 C. C. A. 147, 108 Fed. 5. That these locomotives have passed under the mortgages, and added to the security of the mortgagees, is a circumstance which, by itself, does not entitle the appellant to displace the lien of the mortgages. In the case last referred to we said:

"That the equipment purchased added to the earning power of the railroad company, and has augmented the security held by the mortgagees, is an element to be considered in passing upon the claim; but this fact has never been regarded as in itself justifying the displacement of an antecedent mortgage. International Trust Co. v. T. B. Townsend Brick & Contracting Co., 37 C. C. A. 396, 409, 95 Fed. 850, where the cases are collected and reviewed. In Southern Ry. Co. v. Carnegie Steel Co., 20 Sup. Ct. 362, 44 L. Ed. 475, the supreme court took care to avoid throwing doubt upon the earlier adjudications of that court by saying: 'We must not be understood as saying that a general, unsecured creditor of an insolvent railroad corporation in the hands of a receiver is entitled to priority over mortgage creditors in the distribution of net earnings simply because that which he furnished to the company prior to the appointment of the receiver was for the preservation of the property, and for the benefit of the mortgage securities. That, no doubt, is an important element in the matter. Before, however, such a creditor is accorded a preference over mortgage creditors in the distribution of net earnings in the hands of a receiver of a railroad company, it should reasonably appear from all the circumstances, including the amount involved, and the terms of payment, that the debt was one fairly to be regarded as part of the operating expenses of the railroad incurred in the ordinary course of business, and to be met out of current receipts.'"

3. The claims of Gilbert H. Stewart and of Harrison, Olds & Henderson are claims for professional services rendered to the rail-

road company in special cases, and under special employment. The master reported that neither claim was entitled to be paid out of the corpus of the mortgaged property in preference to the mortgagees. This report he based upon two grounds: First, that such services are not services of the class entitled to preference; second, that there had been no diversion of income either before or after the receivership. The circuit court held that services rendered to a railroad company in special cases, and without regard to the benefit received by mortgagees, stood upon an equal plane with claims of laborers and supply men; but held that neither of the appellants were entitled to be paid out of the corpus of the mortgaged property in preference to the mortgagees. These claims are not for salaries, but for special fees earned in the defense of various actions against the railroad company, which did not involve the rights or interest of the mortgagees of the appellee railroad company, and which, so far as is shown, did not directly contribute to the advantage of the mortgagees. If the order made when the receiver in this cause was appointed be construed as including claims for services of the kind rendered by these appellants, the order did not vest in the claimants described any absolute right to be paid out of the corpus of the mortgaged property in preference to the mortgagees. If the receiver had acted under that order, and paid these claimants out of income, it would doubtless protect him. But he did not. He had no surplus to so apply. When the claimants sought to have their claims paid out of the corpus of the mortgaged property, and thereby displace fixed liens, the court was free to hear the objections to such a decree, and to decide the matter upon settled principles of equity. Railroad Co. v. Wilson, 138 U. S. 501, 506, 11 Sup. Ct. 405, 34 L. Ed. 1023. So, if it had appeared that, after requiring the payment of the claims described in the order as a condition to the appointment of a receiver, surplus income had been appropriated to the mortgagees, or in the permanent improvement of the mortgaged railroad, the court might treat such uses of the surplus income as a diversion, which the mortgagees should make good, as was done in Trust Co. v. Souther, 107 U. S. 591, 2 Sup. Ct. 295, 27 L. Ed. 488. Claims for legal services rendered a railroad company in the ordinary course of its business under special employment, which do not directly contribute in some way to the advantage of mortgagees, do not stand upon a plane with the labor of operatives, or the claims of those who furnish materials or supplies to maintain it as a going concern. This seems to be the plain deduction from the decision in Railroad Co. v. Wilson, 138 U. S. 501, 11 Sup. Ct. 405, 34 L. Ed. 1023, where it was sought to have counsel fees rendered the mortgagor company under special employment preferred over mortgagees. The decree disallowing these claims is affirmed upon this ground.

4. The master reported that there was no surplus of income applicable to the payment of any of these debts, and that there had been no diversion of income for the benefit of the mortgagees, either by the railroad company or the receiver, and that for this reason none of these claims were entitled to payment out of the corpus of the mortgaged property in preference to the mortgagees. The ap-

pellants excepted to his finding that there had been no diversion, and also to his conclusion that, in the absence of such diversion, there could be no preference in proceeds of sale of corpus. We shall consider the last exception and assignment of error first. This court, in International Trust Co. v. T. B. Townsend Brick & Contracting Co., 37 C. C. A. 396, 95 Fed. 850, and in Rhode Island Locomotive Works v. Continental Trust Co. (decided November, 1900) 108 Fed. 5, after a full review of all the decisions of the supreme court in respect to the power and authority of a court of equity to provide for the payment of labor and supply claims in preference to mortgagees, reached the conclusion that preference could be given to such claims only out of the income of the mortgaged railroad, and that mortgages upon the corpus could only be displaced by such creditors when it was shown that there had been a diversion of the income, either before or after the receivership, by which the mortgagees had profited. In Rhode Island Locomotive Works v. Continental Trust Co. we endeavored to formulate from the decisions of the supreme court the principle upon which unsecured creditors might be preferred. Speaking of the claim seeking a preference in that case, we said:

"If the appellant is to obtain any relief, it must show: First, that the demand here presented is not a debt created upon the personal credit of the company, but a current operating expense, incurred to maintain the property as a going concern, and its railroad in condition to be used with reasonable safety for the transportation of persons and property, and with the expectation of the parties that it was to be met out of the current receipts of the company; and, second, that there are net or current earnings now applicable to the payment of such debts of the income, or that there has been a diversion of the current earnings, either before or since the receivership, which the mortgagees should equitably restore. International Trust Co. v. T. B. Townsend Brick & Contracting Co., 37 C. C. A. 396, 95 Fed. 850; Central Trust Co. v. East Tennessee, V. & G. R. Co., 26 C. C. A. 30, 80 Fed. 624; Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 365, 18 Sup. Ct. 657, 42 L. Ed. 1068; Southern Ry. Co. v. Carnegie Steel Co., 176 U. S. 257, 285, 20 Sup. Ct. 347, 44 L. Ed. 458."

The ground upon which this doctrine of the primary appropriation of income to the payment of current operating expenses rests is that the mortgagee impliedly consents. This implication of consent arises from the fact that a railroad mortgage is a very peculiar kind of property. Looking to the long time of such mortgages, the fact that the mortgagor is expected to remain in possession until default, that the value of the property is largely dependent upon its continued operation, and that the preservation of the franchises of such companies depends upon their continual exercise, it is not an unreasonable assumption that "every railroad mortgagee, in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income." Fosdick v. Schall, supra. The displacement of mortgage liens cannot be justified upon any line of reasoning which assumes that one class of creditors may be deprived of the benefits of their contract liens for the benefit of another upon the ground that the public interests are thereby subserved by the maintenance of a railway for the public convenience. Such a position antagonizes the constitutional principle that private property shall

not be taken for the public benefit without compensation. The public character of such companies is only considered as one of the factors in arriving at the conclusion that the mortgagee of the income contracts only in respect to net income. But, if income alone is applicable to the payment of such operating expenses, how has it come about that in many instances such creditors have been paid out of the corpus of mortgaged property? The ground upon which a mortgage upon the corpus may be displaced is most logically stated by Chief Justice Waite in Fosdick v. Schall in these words:

"The power rests upon the fact that in the administration of the affairs of the company the mortgage creditors have got possession of that which in equity belonged to the whole or part of the general creditors. Whatever is done, therefore, must be with a view to a restoration by the mortgage creditors of that which they have thus inequitably obtained. It follows that, if there has been in reality no diversion, there can be no restoration, and that the amount of restoration should be made to depend upon the amount of diversion."

The fact that such claims seem to have been paid in Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117, and that Justice Blatchford does not refer to or discuss the doctrine of diversion of income, has been regarded by some of the circuit courts and by some of the circuit courts of appeal as justifying the displacement of mortgage liens independently of any diversion of income; and counsel in the cases at bar have urged that evidence of a diversion of income is no longer necessary. We cannot give that consequence to that case in view of the restatement of the diversion doctrine in the later cases of Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596, and St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U. S. 658, 673, 8 Sup. Ct. 1011, 31 L. Ed. 832. In St. Louis, A. & T. R. Co. v. Cleveland, C., C. & I. R. Co., last cited, the claimant was denied payment out of the proceeds of sale of the mortgaged property because no diversion of income had been shown. Touching the necessity of proof of such diversion, the court said:

"There are cases, it is true, where, owing to special circumstances, an equity arises in favor of certain classes of creditors of an insolvent railroad corporation otherwise unsecured, by which they are entitled to outrank in priority of payment, even upon a distribution of the proceeds of a sale of the body of the property, those who are secured by prior mortgage liens. Illustrations and instances of these cases are to be found in Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339; Miltenberger v. Railroad Co., 106 U. S. 286, 1 Sup. Ct. 140, 27 L. Ed. 117; Trust Co. v. Souther, 107 U. S. 591, 2 Sup. Ct. 295, 27 L. Ed. 488; Burnham v. Bowen, 111 U. S. 776, 4 Sup. Ct. 675, 28 L. Ed. 596; Union Trust Co. v. Illinois M. R. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; Dow v. Railroad Co., 124 U. S. 652, 8 Sup. Ct. 673, 31 L. Ed. 565; Sage v. Railroad Co., 125 U. S. 361, 8 Sup. Ct. 887, 31 L. Ed. 694; and Trust Co. v. Morrison, 125 U. S. 591, 8 Sup. Ct. 1004, 31 L. Ed. 825. The rule governing in all these cases was stated by Chief Justice Waite in Burnham v. Bowen, 111 U. S. 776, 783, 4 Sup. Ct. 675, 679, 28 L. Ed. 596, 599, as follows: 'That, if current earnings are used for the benefit of mortgage creditors before current expenses are paid, the mortgage security is chargeable in equity with the restoration of the fund which has been thus improperly applied to their use.' There has been no departure from this rule in any of the cases cited. It has been adhered to and reaffirmed in them all. Admitting, therefore, that the reasonable rent of the leased line accruing to the petitioner was a proper charge upon the gross income of the Indianapolis

& St. Louis Railroad Company, as a part of its current operating expenses, before any net income could arise applicable to the payment of the interest on the mortgage bonds, it must still be shown, to entitle the petitioner to the relief prayed for, that the arrearage due on account thereof has arisen by the diversion and misappropriation of the fund that ought to have been applied to its payment to the use and benefit of the mortgage bondholders. Counsel for the petitioner undertake to do this, and insist that upon the proofs in this case it satisfactorily appears that such a diversion and misappropriation have taken place, to its injury, and to the advantage and benefit of the bondholders claiming the fund in court for distribution."

In Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, 365, 18 Sup. Ct. 657, 42 L. Ed. 1068, and in Southern Ry. Co. v. Carnegie Steel Co., 176 U. S. 257, 293, 20 Sup. Ct. 347, 44 L. Ed. 458, the conclusions were founded upon evidence of diversion of income, the opinions being full and elaborate upon this point. We are aware of the fact that in maintaining the necessity for evidence of diversion of income before allowing solemn mortgage securities to be displaced we are in disagreement with other courts of appeal for whose judgment we entertain very great respect. Believing, as we do, that we have correctly interpreted the opinions of the supreme court, and that the limitations which have been placed upon the preferential character of unsecured operating debts are in accord with settled principles of justice, we shall adhere to the views we entertain until the supreme court shall otherwise adjudicate.

5. The master's report upon the matter of diversion is based upon an error of law. He has assumed that the payment of car-trust obligations out of current income is not a diversion. These obligations represented the purchase price for cars, the title being retained by the vendor to secure the price. In this case it appears that these obligations were incurred by one or other of the predecessor companies of the railroad company, and that the latter acquired the equipment subject to unpaid purchase money. The equipment was then included in the mortgages here under foreclosure, and it has been ordered to be sold as the property of the railroad mortgagor, the unpaid balance of purchase money having been paid off by receiver's certificates. It is plain that the payment of car-trust obligations by the railroad company enhanced the interest of the mortgagees in such equipment. To the extent that such prior obligations were paid off, the mortgagees were benefited. Debts incurred for the purpose of making additions to the permanent equipment and motive power of a mortgaged railroad are not current operating expenses for supplies or materials, and are not preferential debts. Rhode Island Locomotive Works v. Continental Trust Co., cited above. If such debts would not be preferential debts if unpaid, their payment out of a fund primarily applicable to such debts is a diversion which the bondholders must make good if they were thereby benefited. It is said, in support of the report, that money was received from the sale of bonds, and from sources other than current earnings, which more than made good any income applied to car-trust obligations. If that is true, the appellants cannot complain. Central Trust Co. v. East Tennessee, V. & G. R. Co., 26 C. C. A. 30, 80 Fed. 624; St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. R. Co., 125 U. S.

658, 675, 8 Sup. Ct. 1011, 31 L. Ed. 832. The question is one which must involve a careful examination of the books of the railroad company by persons expert in such matters. The master's report, standing as it does upon an erroneous principle of law, is of little or no value. The exception pointing out this error should have been sustained.

The decree confirming the master's report, so far as it found there had been no diversion of income, will be reversed, and the causes of Winfield S. Gregg, The Adams & Westlake Company, the Louisville & Nashville Railroad Company, and the Baltimore & Ohio Southwestern Railroad Company will be remanded to the circuit court, with directions to reopen the master's report upon the question of diversion of income, and refer same, with leave to both parties to take additional evidence. The costs of this appeal in the four cases mentioned will be paid by the receiver. The decree in the cause of the Columbus Terminal Company, and of G. H. Stewart, and of Harrison, Olds & Henderson will be affirmed, with costs