GREGG v. METROPOLITAN TRUST CO. et al.

(Circuit Court of Appeals, Sixth Circuit. July 18, 1903.)

No. 1,162.

1. RAILROADS—FORECLOSURE—PREFERENCE—DIVERSION OF EARNINGS—REIMBURSEMENT.

The gross earnings of a railroad company are reimbursed for a diversion to the benefit of mortgagees, so that the current operating expense creditors are not entitled, on account of the diversion, to a preference from the proceeds of the corpus of the mortgaged property when sold on foreclosure, where the company borrows money on its notes, secured by its mortgage bonds, and the proceeds are passed to its general credit in the banks making the discount, and then checked out to pay current expenses, the money not being borrowed to pay any particular debts.

2. SAME—CURRENT INCOME—SALE OF MILEAGE.

Where a railroad company sells to brokers and others mileage in bulk, and at a discount, over other railroads, for whom it acts in issuing the same, the proceeds not accounted for to them, but used for its own purposes, are not part of its current income, as respects the rights of its current operating expense creditors and mortgagees relative to the questions of diversion from and reimbursement of its gross earnings.

Appeal from the Circuit Court of the United States for the Southern District of Ohio.

This is a second appeal. In the former case we decided that preferential six months' claimants had no preference over mortgagees in the proceeds of the corpus of the mortgaged railroad property, unless there had been a diversion of the current earnings which the mortgagees should equitably restore, and that the burden was upon such claimants to show such diversion. We reversed the former decree, denying a preference to Gregg and certain other claimants who had established debts entitled to preference of payment out of current income, upon the ground that the master, in reporting that there had been no diversion of income during the six months preceding the receivership, had erred in treating car trust debts as debts of the income, and properly payable out of current income, and remanded the case for a re-reference, with leave to take further evidence. Gregg v. Mercantile Trust Co., 109 Fed. 220, 48 C. C. A. 318. The master has again reported that there was no diversion for which the mortgagees could be made accountable. Exceptions by appellant were overruled, and preference again denied to the appellant. From this decree an appeal has been prosecuted.

Harlan Cleveland, for appellant.
Morrison R. Waite and Herbert Parsons, for appellees.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

LURTON, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

There is no surplus income arising from the operation of the receiver applicable to the payment of this or any other debt, nor is it claimed that there was any diversion of income by the receiver, by which the mortgage creditor profited, upon which to found an equity against the bondholders. Burnham v. Bowen, 111 U. S. 776, 782, 4 Sup. Ct. 675, 28 L. Ed. 596; International Trust Co. v. Townsend Brick Co., 95 Fed. 850, 37 C. C. A. 396, 405. The proceeds of the sale of the mortgaged property are insufficient to pay the mortgage debts, and, if the appellant is to be paid at all, he must be paid at the expense of the

124 F.—46

mortgage creditors out of the proceeds of the sale of the mortgaged property. Before the mortgage creditors can be displaced in respect of the corpus of the property, it must appear that the current earnings which accrued during the period shortly before the receivership were not applied to the payment of current operating expenses incurred within the same period, but were used in the permanent improvement of the property mortgaged, or for the payment of the mortgage debt, and that, as a consequence of this misapplication, current expense creditors have been disappointed. This is the well-settled rule in respect of the payment of these so-called preferential debts of the income. Central Trust Co. v. East Tenn., V. & G. Ry. Co., 80 Fed. 624, 26 C. C. A. 30; International Trust Co. v. Townsend Brick Co., 95 Fed. 850, 37 C. C. A. 396; Rhode Island Locomotive Works v. Continental Trust Co., 108 Fed. 5, 47 C. C. A. 147. This was the law as declared in the opinion upon the former appeal and as such is the law of the case. Gregg v. Mercantile Trust Co., 109 Fed. 220, 227, 48 C. C. A. 318.

For the sole purpose of permitting certain creditors of the income to establish, if they could, that there had been a diversion of current earnings by which the mortgagee had profited, and the extent of such diversion, we remanded this case, that additional evidence might be heard by the special master, and a report made. Upon this second reference the master reported that during the six months next preceding the appointment of a receiver claims aggregating $99,215.49 had been paid by the railroad company, which had inured to the benefit of the mortgage creditors. The items were as follows:

| | |
|---|---:|
| Car Trust notes | $88,209 31 |
| Interest on bonds | 5,504 53 |
| Sidings | 3,045 45 |
| Land purchased | 2,257 20 |
| | $99,215 49 |

The appellant excepted, because he did not report two other items, which he claimed were of like character, viz.:

| | |
|---|---:|
| For car couplers to replace couplers in use, to comply with act of Congress | $2,712 54 |
| Expenditure on Union Depot viaduct | 442 44 |

The master did not report the aggregate earnings during that period, and it is not possible, from the report alone, to know whether the gross current earnings of the company were sufficient, if properly applied, to have paid the current operating expenses, and leave a net income which was sufficient to have authorized the expenditure for permanent improvements and equipment and the payment of interest upon the mortgage debt shown to have been made during that period. But the master also reported that during the same period of time the company received from sources other than current earnings the following amounts:

| | |
|---|---:|
| Money borrowed | $127,781 25 |
| Money collected from sale of mileage books | 98,712 54 |
| Old earnings collected (not current) | 2,148 47 |
| | $228,642 26 |

But, if it be assumed that the gross earnings were insufficient to pay current operating expenses and leave a surplus which might be properly applied to the permanent improvement of the property and interest upon the mortgage debt, then the master has reported that gross earnings were more than reimbursed by the money derived from other sources. In Central Trust Co. v. East Tenn., V. & G. R., 80 Fed. 624, 26 C. C. A. 30, 32, it was shown that during the period covered by the creation of the preferential claims under consideration the net earnings were insufficient to justify the payment of interest on the mortgage debts and to make certain improvements which had been made. In determining whether a case had thereby been made for compelling a restoration by the mortgagees, this court said:

"But it is also shown that during the same period money was borrowed on open account more than sufficient to equal the diversion complained of, which went into a common treasury, from which operating expenses, preferential claims, interest, and improvements were paid, without any definite showing as to whether the borrowed money was applied to the payment of interest and improvements or to current income debts. Under this system of bookkeeping, the addition of borrowed money to the income arising from operation showed a substantial surplus after payment of the great mass of income debts, and all disbursements on account of interest upon the two mortgages foreclosed, as well as upon improvements in the roadway. Prior to the period covered by the maturity of appellant's claims, there was a surplus of gross earnings over all operating expenses; but it cannot be contended that the company was under any obligation to future creditors to accumulate a surplus to meet possible deficiencies in the income to meet future income debts, or that it was improper to apply such surplus in payment of interest. St. Louis, A. & T. H. R. Co. v. Cleveland, C., C. & I. Ry. Co., 125 U. S. 658–675, 8 Sup. Ct. 1011, 31 L. Ed. 832. Whatever diversion there may have been of income to payment of debts or liabilities not properly debts of the income, seems to have been more than reimbursed by the money borrowed. The burden is upon complainants to show that there has been a misappropriation of earnings to the improvement of the mortgaged property, or to the payment of interest, before the mortgagees can be justly called upon to reimburse the fund applicable to debts of the income in consequence of such diversion. If interest was paid or improvements made out of borrowed money, then there was no diversion; or, if made out of gross earnings, and the latter was reimbursed by borrowed money, the diversion was made good. The abstracts showing income from all sources and disbursements upon all accounts are somewhat complicated, in consequence of the mode of bookkeeping adopted. The commissioner and court below concurred in reporting that here was no diversion shown. In the absence of the very cogent evidence of mistake of fact, or of some error of law, the finding of fact by the commissioner must be accepted as final. Emil Kiewert Co. v. Juneau, 78 Fed. 708, 24 C. C. A. 294; Kimberly v. Arms, 129 U. S. 512–524, 9 Sup. Ct. 355, 32 L. Ed. 764; Tilghman v. Proctor, 125 U. S. 136, 8 Sup. Ct. 894, 31 L. Ed. 664; Turley v. Turley, 85 Tenn. 256, 1 S. W. 891."

In reversing this case upon the former appeal we affirmed what has been said in the case cited, and in directing a reference we said:

"It is said, in support of the report, that money was received from the sale of bonds, and from sources other than current earnings, which more than made good any income applied to contract obligations. If that is true, the appellant cannot complain." 109 Fed. 220, 227, 48 C. C. A. 318.

But it is contended that no such reimbursement of "gross earnings" has been shown in this case as was shown in the case cited above. To make the distinction, the appellant excepted to the item of $127,781.35. money borrowed as a reimbursement of the gross earnings fund, be-

cause only $430.17 of the money so borrowed was in fact paid into the "common treasury," the remainder being paid out upon certain specific debts of the company without reaching the treasury. He also excepted to the item of $98,712.54, realized from the sale of mileage on account of other railroads, and not accounted for to them, upon the ground that this was not money derived from a source other than current earnings, and should have been so treated.

First, as to the money borrowed during the period under inquiry. The master reports that this was money borrowed from banks on the promissory notes of the company at different dates, and secured by first mortgage bonds of the company, deposited as collateral security. By a stipulation filed in this court it is agreed that these notes were never paid, and that the bonds constitute a part of the bonds secured by the mortgage herein foreclosed, and that these bonds will share equally with the other bonds secured by the mortgage, which appellants seek to displace. Thus this so-called borrowed money has been, in effect, contributed by the mortgagees against whom appellant asks equitable relief. This borrowed money is shown to have been checked out for the following purposes:

| | |
|---|---:|
| To pay Car Trust notes | $22,629 83 |
| To the payment of current pay roll | 70,370 17 |
| Upon general debts of the company, not beneficial to the bondholders, and not current operating expenses entitled to preferential payment | 33,569 44 |
| To the treasury of the company | 430 17 |
| | $126,999 61 |

The item of $22,629.83 was used in payment of Car Trust notes constituting part of the $88,208.31 charged in the report as a diversion. It is very plain that the alleged diversion must be cut down to this extent, for to that extent it is demonstrated that there was no misapplication of the fund arising from current operating receipts, which is the only fund chargeable in equity with current expense debts. If we deduct this amount from the reported aggregate of apparent or possible diversions, we have $76.585.66 as the sum which has been paid out to the mortgage creditors, or for their benefit. But it is further shown that of this money, raised at the direct expense of the mortgage creditors, $70,370.17 was paid in reduction of existing current expense claims, viz., labor claims constituting current pay rolls. If the right of the creditors of the class to which Gregg belongs to displace prior fixed liens be a purely equitable right bottomed upon the theory that the mortgagee has received something which he cannot equitably retain, it would seem most inequitable that the payment of current labor claims by money borrowed through an enlargement of the mortgage debt should be disregarded in the adjustment of the equities of the two classes of creditors solely because the money so borrowed is shown to have been directly applied to their payment without first having been paid into what is figuratively called "the common treasury." But for this payment of the current pay rolls with money in effect contributed by the mortgage creditors, the unpaid debts of the income would now be $70,000 greater than they are. That such payments did not directly profit Gregg, as his debt is still unpaid, is no answer.

We must deal with the creditors of the income and the creditors by mortgage, for the purpose of such a proceeding as this, as constituting two classes of creditors. It is only upon this plan that Gregg has any standing whatever, for his debt was created during the month immediately preceding the receivership, and was not payable until after the date of the appointment of the receiver. If his rights are to be dealt with separately and apart from other creditors of his class, he would have no standing, for there is no pretense of a diversion after his debt was made. We must also treat "gross earnings" for the period of six months preceding the receivership as a single fund, and all debts made for current operating expenses during that time as equally payable out of that fund before any part of it is justly applicable for other purposes. But, if we do this, we must also regard all contributions made to that fund, during the same period, from sources other than income from operation, as a reimbursement pro tanto on account of payments therefrom either for permanent improvements or mortgage interest. The remainder of the borrowed money was paid out upon general debts, debts which were not debts of the income nor of advantage to the mortgage creditor.

Now, it is conceded that if this borrowed money had been paid into what is called the "common treasury" of the company, and then paid out in usual course, that the gross earnings fund would thereby have been reimbursed, and the case brought precisely within the facts of St. Louis, etc., R. Co. v. Cleveland, etc., Ry. Co., 125 U. S. 658, 675, 8 Sup. Ct. 1011, 31 L. Ed. 832, and Central Trust Co. v. East Tenn., V. & G. R. Co., 80 Fed. 624, 26 C. C. A. 30, 32. But what is the "common treasury"? Money which is subject to the disposition of the financial agents of the company may be said to be money in the common treasury, although it may be in different banks and arise from many sources. There is no evidence of any special method of keeping the funds, and the proceeds of these discounted notes seem to have been passed to the general credit of the company in the bank making the discount, and then checked out to pay such obligations as the company saw fit to pay. The mere circumstance that the money is deposited to the credit of the company in one or several banks, if the deposits were alike subject to the checks of the company, is of no significance, for it is in the common treasury of the company in as full a sense as if but one account had been kept. There is no evidence that any part of this money was borrowed to pay the particular debts to which it was in fact appropriated, and the fair inference is that the fact that the proceeds of these discounted notes were paid out upon particular debts was only accidental. But it is said that the reimbursement of gross earnings improperly applied to improvements or mortgage interest by money arising from other sources only operates to relieve the bondholders from liability to restore because the mingling of money arising from current earnings with such other money makes it impossible to say whether in fact current earnings have been misapplied, for it may be that the mortgage interest paid or the permanent improvements made were in fact paid from the fund which arose from such other sources. This fact that general debts to the extent of about $33,000 were paid out of borrowed money, and not out of the

"gross earnings fund," is a fact which does distinguish this case from the two cases in which that fund was held to be reimbursed by borrowed money, and is a fact of some significance in the administration of this equity in favor of preferential debts of the income; for it cannot be said that the gross earnings depleted in favor of the bondholders has thereby been made good. We shall therefore ignore this item of $33,000 borrowed money as not a reimbursement of the current earnings fund, because it was never in fact paid into that fund, nor applied in easing that fund by the payment of claims which were an equitable charge thereon.

Excluding this part of the money borrowed, the account between the two classes of creditors stands thus:

| | |
|---|---:|
| Diversion reported by the master | $99,215 49 |
| Reimbursements of that fund: | |
| Borrowed money applied to pay Car Trust notes | $22,629 83 |
| Borrowed money applied to pay pay rolls | 70,370 17 |
| Old collections not current income | 2,148 47 |
| Borrowed money paid to company treasury | 430 15 |
| Total reimbursements | $95,578 62 |
| Balance of diversions | 3,636 87 |
| | $99,215 49 |

There, however, remains as an additional reimbursement the sum of $98,712.54, which was paid into the current income fund from the sale of mileage books sold on account of other railroads, and not accounted for to them. This item was excepted to upon the ground that it did not represent money derived from a source other than current earnings. The exception was overruled, and it is now assigned as error. The contention is that this was in fact current earnings, and should be treated and regarded as a fund primarily appropriated to the payment of current income debts. If this were conceded, the result would be to enlarge the current income fund to that extent. If that fund was $98,712.54 larger than shown by its exclusion, it may be that the gross earnings thus swelled would be large enough to provide a fund sufficient to pay current operating expenses and leave a net income ample to make the improvements and pay the interest by which bondholders have profited. To ascertain how this would leave the matter would require a recasting of the master's report, for we have already referred to the fact that he has failed to report whether the gross earnings were insufficient to justify the payments which he has reported as diversions. But we are of opinion that this item of receipts was properly reported as an extraordinary item, not properly to be regarded as current income. Mileage books were sold in bulk, and at a discount, to brokers and others, aggregating $128,000. These books represented mileage over the C. S. & H. R. Co. and other railroads for whom it acted in issuing such books. Of this, $98,712.54 represented the price of mileage sold and collected on account of other railroads, and as such constituted a part of the traffic balance due to such roads. Concerning the transaction, the master, who had all the witnesses and books before him, reports as follows:

"This money was never treated as current earnings by the accountants of the company. It was carried in a suspense account. The mileage books were

sold at a discount (about $16 per book; price about $20). The transaction, apparently, amounted to the borrowing of that much money by the railroad company on the security of the mileage books, the money to be repaid in the future in the services of the C. S. & H. Railroad Company by the carrying of passengers, or in similar services of other railroad companies, who were to be reimbursed by the C. S. & H. Railroad Company for such services. Could a sale of bonds to raise money be distinguished, in principle, from such sale of mileage books, made in quantities to brokers, and at such discounts as to preclude any probability that the transaction was a mere selling of tickets in the usual course of business? It appears to have been resorted to as a means of raising money on the general credit of the railroad company after all ordinary means of doing so had been practically exhausted. The mileage books were promises to render services on presentation, and sold as they were, in the way they were, in bulk, and on the faith of the general credit of the railroad company, and it appears to this amount not accounted for, the proceeds seem distinguishable from earnings."

It is difficult to see why money derived from such a source should be regarded as ordinary current income, such as is primarily devoted to ordinary current operating expenses. By the transaction the company created a debt to each of the companies upon whose lines such mileage was sold. The company itself did not regard it as current earnings, and did not carry the income in that account. Merion, the auditor, testified that the money thus raised was "paid out for anything we had to pay; it went direct to the treasurer." Now, it is evident that, if these proceeds had been used to pay mortgage interest, the current operating expense creditors could not complain, and equally evident that, if the payments claimed to be diversions were paid out of the fund thus swelled, that fund was thus reimbursed to the full extent of this fund from a source other than current income.

We see no error in the decree, and it is accordingly affirmed.