EQUITABLE TRUST CO. OF NEW YORK v. WABASH R. CO. et al.

BIXBY et al. v. BLAIR et al.

(Circuit Court of Appeals, Sixth Circuit. June 15, 1916.)

No. 2965.

1. POST OFFICE ⊛⟩21(4)—COMPENSATION FOR CARRYING MAILS—RIGHTS AS BETWEEN CARRIERS.

There was an established mail route over the W. Railroad from Detroit to Chicago, the compensation for which was fixed each four years by weighing all the mail transported over any part of the route. The trains of the P. Railroad between Toledo and Detroit ran over the W. Company's tracks from Romulus to Detroit; the P. Company receiving all of the revenue and paying the W. Company on an agreed trackage basis. On such trains the P. Company carried, as far as Toledo, through mails from Detroit to Cincinnati, and the mail so carried was included in that on which the compensation of the W. Company was fixed, and the W. Company was accordingly paid for the transportation thereof to Romulus. Compensation was similarly paid for the use of mail cars and for hauling them, and the W. Company recognized its obligation to pay the P. Company the portion of the compensation representing the cars hauled by that company, and regularly paid such compensation to the P. Company. *Held*, that there was an implied contract by the W. Company to pay to the P. Company the compensation received for carrying such mail, as it was the W. Company's duty to carry such mail under its agreement with the Post Office Department, and the P. Company therefore performed

the services in discharge of the underlying liability of the W. Company, for the use and benefit of that company, and the W. Company accepted such services and received the benefit thereof; nor was it material that the carrying of the mail by the P. Company was by direction of the department, as this direction pertained merely to the efficiency of the service, and not to the contract for payment.

2. POST OFFICE ☜21(4)—COMPENSATION FOR CARRYING MAILS—RIGHTS AS BETWEEN CARRIERS.

The rule that a contract to pay cannot be implied against one who receives the benefit, where he has had no opportunity to elect, did not apply, since, while the department ordered the carrying of the mail by the P. Company, and the W. Company had no election in the specific thing, yet it voluntarily made the contract by which it put the P. Company in a position to be subject to the order, and voluntarily participated in presenting to the department the weights of the mail in question as a part of the basis of its compensation, and voluntarily received such compensation from the department.

3. POST OFFICE ☜21(4)—COMPENSATION FOR CARRYING MAILS—RIGHTS AS BETWEEN CARRIERS.

As the W. Company expressly admitted the right of the P. Company to the mail car pay, there was no room for the inference that the services were intended to be gratuitous, as there was no substantial difference between the two classes of compensation.

4. RAILROADS ☜208—RECEIVERS—EXPENDITURES—"TRAFFIC BALANCE."

The receivers of the W. Company were authorized to pay such compensation to the P. Company by the order appointing them and authorizing them to pay all ticket, traffic, and car mileage balances, etc., due or coming due to connecting or other railroads, since, while the amount involved was not a "traffic balance," in the strictest and most common use of that phrase, it could not be substantially distinguished therefrom.

5. RAILROADS ☜213—RECEIVERS—PRESENTATION OF CLAIMS—ANCILLARY PROCEEDINGS.

Where receivers were appointed for the W. Company in Missouri, and an ancillary bill filed in the Eastern district of Michigan, on which the same receivers were appointed, the claim of the P. Company should be presented to the Michigan court, within whose territory the operations giving rise to the indebtedness occurred, if that court was independently administering the property in its jurisdiction, and was in a position to subject the property in Michigan to its decree, but otherwise the application should be made in Missouri.

Appeal from the District Court of the United States for the Eastern District of Michigan; Arthur J. Tuttle, Judge.

Suit by the Equitable Trust Company of New York, trustee, against the Wabash Railroad Company and another, in which William K. Bixby and another were appointed receivers of such railroad, and in which Frank W. Blair and others, receivers of the Pere Marquette Railroad Company filed an intervening petition against the Wabash receivers. From an order requiring the Wabash receivers to pay the claim of the intervening petitioners, the Wabash receivers appeal. Affirmed.

N. S. Brown, of St. Louis, Mo., for appellants.

John C. Bills, of Detroit, Mich., for appellees.

Receivers were appointed for the Wabash Railroad Company in a mortgage foreclosure suit in the United States District Court at St. Louis, and since part of the railroad lay in the Eastern district of Michigan an ancillary bill was filed in that district, and the court therein appointed as receivers the same persons theretofore appointed in Missouri, which appointment had been

made December 21, 1911. The District Court for the Eastern District of Michigan also duly appointed receivers for the Pere Marquette Railroad Company. In May, 1914, the Pere Marquette receivers filed an intervening petition in the ancillary suit in which the Michigan appointment of receivers for the Wabash had been made, and thereby the Pere Marquette receivers asked that the Wabash receivers be directed to pay over certain sums which the Wabash and its receivers had received from the Post Office Department for carrying the mails, and which it was claimed equitably belonged to the Pere Marquette receivers. By the pleadings and upon a hearing before a special master, to whom the issue was referred, the following facts appeared:

The Pere Marquette, running northwesterly from Toledo, did not reach Detroit. The Wabash, running southwesterly from Detroit, did not reach Toledo. The two roads intersected at Romulus. In 1904 the Pere Marquette made an arrangement with the Wabash (put into a formal written contract in 1910) by which the Pere Marquette was permitted to run its complete passenger trains, including mail and express cars, between Romulus and Detroit over the Wabash tracks, and it paid therefor to the Wabash compensation upon an agreed trackage basis—all the revenue belonging to the Pere Marquette. There was an established mail route over the Wabash tracks from Detroit to Chicago. The compensation which was received by the Wabash was fixed at the beginning of each four-year period by weighing all the mail transported over any part of this route. The Pere Marquette (under an arrangement with the Cincinnati, Hamilton & Dayton, running from Toledo to Cincinnati) was carrying as far as Toledo through mails from Detroit to Cincinnati, and used therefor the Wabash tracks from Detroit to Romulus. Such Detroit-Cincinnati mail, passing over part of the Detroit-Chicago route, was weighed as a part of that which fixed the basis of compensation to the Wabash for the Detroit-Chicago route; and accordingly the compensation for carrying this Cincinnati mail between Detroit and Romulus was paid by the Post Office Department to the Wabash. The compensation so paid included as well charges for the use of mail cars furnished to the department for its use as railroad post offices and for the hauling of such cars. The compensation for such hauling and that for the carrying of the mail measured by weight were always separately computed and paid.

After the beginning of this arrangement, the question whether this compensation so earned by the Pere Marquette, and received by the Wabash, should be retained by the latter or turned over to the former was overlooked. In December, 1905, the manager of the Pere Marquette wrote to the president of the Wabash, reciting the situation, and saying: "We are, as you know, operating our trains over your line Romulus to Delray [a Detroit suburb] on a trackage arrangement and of course we are entitled to all the revenue. Will you kindly authorize us to make bill against your company for the amount paid to your company by the government which should have been paid to the Pere Marquette, that is $1,713.60?" To this, March 28, 1906, the president of the Wabash replied: "We have concluded that we should refund to you the amount we receive from the Post Office Department for mail compensation, and I have given instructions to have a voucher prepared in your favor covering the amount received up to December 31, 1905, viz. $1,713.60, and to have voucher made in your favor quarterly hereafter as long as you pay us for trackage under the old arrangement." This demand and payment in fact covered only the amounts paid for railway mail cars, since the payment of compensation by weight did not commence until the beginning of the next four-year period, viz. July 1, 1907.

The mail car compensation received by the Wabash has been continually paid over to the Pere Marquette, and no question concerning the same now exists. After the weight payments began, in July, 1907, the Pere Marquette officials made no claim against the Wabash for any part thereof, but apparently assumed, without looking into the matter, that the payments being made by the Wabash covered all the compensation the Wabash was receiving but which the Pere Marquette had earned. After the Pere Marquette receivers were appointed, they discovered in 1912 that such mail compensation paid and received on the weight basis had not been turned over, and they made

demand therefor on the Wabash receivers. The demand was refused, and this petition was filed.

The theory of the petition was that the moneys in question were received by the Wabash for the use and benefit of the Pere Marquette. The answer of the Wabash receivers denied liability, and set up that it was the imperative duty of the Pere Marquette, if it desired to receive any of this mail compensation, to proceed in the manner pointed out by the post office regulations for the establishment of a "lap route," which would authorize payment to be made by the department directly to the Pere Marquette. The special master, after finding the facts in detail found, as conclusions of law, that there was no implied contract, but that there was a liability as for money had and received; that the money was owing to the Pere Marquette, and not to the Cincinnati, Hamilton & Dayton; and that the claim was within the class which the order appointing the Wabash ancillary receivers directed them to pay, part of it as a preferred claim, and part of it as an expense of operation. These defenses have been treated by all parties as properly involved, and are the only ones argued in this court. On exceptions to the report, the District Court sustained the special master, and an order was entered that the Wabash receivers forthwith pay to the Pere Marquette receivers the whole sum claimed, with interest.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

DENISON, Circuit Judge (after stating the facts as above). Both the special master and the District Judge put the liability of the Wabash on the ground of an equitable obligation which made the money received by the Wabash "money paid for the use and benefit of" the Pere Marquette. Elaborate arguments are presented to us both in support of and against this theory; but we do not believe it necessary to decide that issue.

[1] Both tribunals have rejected the theory of implied contract because they thought the services of the Pere Marquette were not rendered to or for the Wabash, or in discharge of any obligation of the Wabash, but were rather rendered directly to the department and at its request—so that the promise to pay would be implied, if at all, against the government and not against the Wabash. This conclusion rightly follows from the grounds so assumed; but we think the premise is wrong. This Cincinnati mail from Detroit and as far as Romulus was a part of that covered by the contract between the Wabash and the department for the Detroit-Chicago route. Under the contract between the Wabash and the department, as the matter existed in 1904, it would have been the duty of the Wabash to carry this mail itself, on its own trains, as far as Romulus, if it had been so directed, and without any additional compensation. By virtue of the weighing done in 1907, a duty to pay extra compensation for this mail was recognized and liquidated, but it was recognized as a duty to the Wabash, and the agreed price was continually paid to the Wabash. So far as concerns the paying of compensation, it was immaterial to the department whether the work was performed by the Wabash or by some lessee on the Wabash rails. The special direction that this mail be carried by the Pere Marquette pertained to the efficiency of the service and not to the contract for payment. After the weighing period of 1907, if not before, there is fair analogy to a case where the owner of property has agreed with one general contractor that certain work shall be done, but has reserved

the right to direct that particular portions of the work shall be done by particular subcontractors, as might be determined with reference to the convenience of work that the same subcontractor might be elsewhere doing for the same owner.

In view of the whole situation, we think it quite right to say that these services were performed by the Pere Marquette in discharge of an underlying liability of the Wabash, and substantially for the use and benefit of the Wabash, that the services were accepted by the Wabash, and that it received the benefit thereof, viz. the sums of money paid to it on this account. Here we find all the elements of an implied contract.

[2] It is said that a contract to pay therefor will not be implied against one who receives the benefit unless he had an opportunity to elect, and that a man cannot be forced to pay for what he has had no chance to refuse. Zottman v. San Francisco, 20 Cal. 96, 81 Am. Dec. 96. This may be conceded as a general rule, but it will not control in this case. It is true that the department directed the Pere Marquette to carry this mail, and that the Wabash had no election in the specific thing; but it had voluntarily made the contract by which it had put the Pere Marquette in a position to be subject to this order, and out of which this order might have been anticipated, it had voluntarily participated in presenting to the department the weights of this mail carried over this section of its Detroit-Chicago route as a part of the basis of its compensation for that route, and it had voluntarily collected and received from the department this very compensation. The case is quite barren of the element of compelling a man to pay for something which has come to him against his will, or not as the natural result of his own actions.

[3] There is no room for any inference that the services were intended to be gratuitous. When another branch of the same subject-matter—the mail car pay—came to the attention of the parties, the Pere Marquette demanded that such pay be turned over, and the Wabash expressly admitted that the demand was rightful and promised to comply; and it has continually performed this promise. There is no substantial distinction between the mail car pay and the weighed mail pay; and, when the latter subsequently came into existence, to say that there was an intention for the Pere Marquette to perform the service and for the Wabash to get and keep the pay, is inconsistent with the action of both parties.

It appears that the entire running of trains by the Pere Marquette between Detroit and Toledo was pursuant to a contract between the Pere Marquette and the Cincinnati, Hamilton & Dayton, to enable the latter to get its Cincinnati-Toledo cars through to Detriot, and by which contract the Cincinnati, Hamilton & Dayton paid to the Pere Marquette a stated monthly compensation and was entitled to all the net revenue. Objection was made to allowing the Pere Marquette receivers to recover as for money received by the Wabash for their use and benefit, because, it was said, they were not the real beneficiaries, since as between themselves and the Cincinnati, Hamilton & Dayton, the fund in question equitably belonged wholly to the latter. Counsel conceded that this objection would not have force if the obligation of

the Wabash to pay the Pere Marquette rested on contract between them; and as we have adopted and approved the theory of an implied contract, this matter need not be considered.

[4] At the time the Wabash receivers were appointed, $10,025.63 of the sum awarded below had accrued, and, according to the view which we have taken, was then a debt from the Wabash to the Pere Marquette. The Wabash receivers claim that this was only an ordinary contract debt, and that they should not have been directed to pay it preferentially. The order made by the District Court for the Eastern District of Missouri, apparently in connection with the appointment of receivers, said:

"Said receivers are hereby authorized and directed from time to time, out of the funds coming into their hands, to pay * * * all ticket, traffic and car mileage balances, car per diem and amounts for car and equipment repairs, which are due or may become due to connecting or other railroads. * * *"

We think this order clearly covered this debt. It was not only an authority, but a direction, to the receivers to pay it out of income. It is true, as urged, that the amount was not a traffic balance in the strictest and most common use of that phrase, but it cannot be substantially distinguished therefrom. If the Pere Marquette had carried Chicago freight from Detroit to Romulus and there delivered it to the Wabash, which had collected the freight money at destination, the division coming to the Pere Marquette would have been on one side of the account in striking the typical traffic balance. For the purposes of these trains the rails from Detroit to Romulus were Pere Marquette rails. The Wabash collected the entire contract price for carrying all the mail hauled over any portion of the Detroit-Chicago route, but part of the mail paid for was hauled part of the way by the Pere Marquette. Not only does the language used fairly cover the situation, but we find facts which would naturally and rightly give rise to this direction, thus specifically interpreted. Connecting railroads have current accounts, back and forth, covering traffic, car mileage, etc.; one side is offset against the other side; one side is due to the railroad going into receivership, and will be withheld unless the receiver will recognize and pay the correlative indebtedness. In this very case the Pere Marquette was becoming currently indebted to the Wabash upon the trackage contract, and the Wabash did in fact sometimes withhold payments of the railway mail car compensation until the Pere Marquette paid the trackage rental. Both of the two subject-matters were not only in fact, but were regarded by both parties as, parts of one debit and credit account, upon which the balance might be either way. The fact that by mutual mistake the item of compensation for the weighed mail was being omitted from the accounts as currently stated can make no difference in the interpretation of the order.

It was also urged below, and is insisted here, that a debt of this kind could not be permitted to displace the security of the bondholders whose mortgage was underlying. The District Judge did not expressly pass upon this question. The record is insufficient to inform us whether the debt can be paid out of income, or whether resort to the body of the property is necessary. If it is claimed that such resort

will be necessary, and that the mortgagees will therefore be prejudiced, we think the burden is on the Wabash receivers to bring this fact to the attention of the court and take its further direction.

[5] Since this indebtedness of $10,025.63 was the result of operations upon that part of the Wabash road within the Michigan jurisdiction, we think the application should be made to the court below, if it is independently administering the property in its jurisdiction, and if it may be in a position to subject the body of the property in Michigan to its decree; otherwise, the application should be to the District Court in Missouri.

The order below is affirmed, without prejudice to further proceedings in accordance with this opinion.