VIRGINIA PASSENGER & POWER CO. et al. v. LANE BROS. CO.

(Circuit Court of Appeals, Fourth Circuit.  December 15, 1909.)

No. 910.

1. STREET RAILROADS (§ 54*)—MORTGAGES—IMPROVEMENT EXPENSES—PRIORITY OF LIEN.

A street railroad mortgagee, in accepting his security, impliedly agreed that the current debts of the mortgagor incurred in the ordinary course of business should be paid from the current receipts before the mortgage had any claim on the income, and that the income out of which the mortgagee was entitled to be paid was the net income after deducting from the gross earnings for necessary operating and managing expenses, proper equipment, and useful improvements.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 133; Dec. Dig. § 54.*]

2. STREET RAILROADS (§ 54*)—MORTGAGES—IMPROVEMENTS.

An electric railway and light company contracted with claimant for the improvement of a water power to be used instead of steam at one of its plants, where the equipment was old, unreliable, and liable to break down. The contract provided for monthly payments in "current funds," and prior to the corporation's insolvency payments had been made from the general income and charged to "construction work." Receivers having been appointed for the corporation, they were ordered to continue the work on their representation that a failure of the steam plant would stop all the street cars on certain of the lines and throw one of the towns in darkness, and that a completion of the water power would amount to a considerable annual saving in operating expenses. When the receiver was appointed, the current income was more than sufficient to pay current expenses and the monthly payments under the contract, and the receivers paid the claimant for the work done after their appointment. *Held*, that the work was not new construction, but a permanent improvement, and hence the contractors were entitled to payment of the indebtedness incurred and unpaid prior to the appointment of receivers as a preferred claim as against mortgagees.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. § 133; Dec. Dig. § 54.*]

Appeal from the Circuit Court of the United States for the Eastern District of Virginia.

Suit by the Equitable Trust Company of New York, as trustee, and another, against the Virginia Passenger & Power Company, for the foreclosure of certain mortgages issued to the trustees, in which Lane Bros. Company intervened for the allowance of a balance due on an improvement contract as a preferred claim.  From a judgment allowing the claim of preference, the power company and the trustees appeal.  Affirmed.

Eppa Hunton, Jr. (Munford, Hunton, Williams & Anderson, on the brief), for appellants.

David H. Leake and Thomas S. Martin (D. H. & Walter Leake, on the brief), for appellee.

Before GOFF and PRITCHARD, Circuit Judges, and BRAWLEY, District Judge.

BRAWLEY, District Judge. In the case above stated, which was for the foreclosure of certain mortgages to the trustees therein named, Lane Bros. Company filed its intervening petition, alleging that it entered into a contract with the Virginia Passenger & Power Company August 15, 1903, to widen and deepen the Appomattox Canal on the Southern bank and near to the Appomattox river, in Dinwiddie county, Va., by excavating and removing earth and rock and performing the work incident thereto. This work was undertaken in order to produce power by water instead of by steam at the Petersburg plant, which was at that time a very old one, equipped with old machinery, the reliable life of which was passed. The intervening petition and the cause generally was referred to the Honorable A. L. Holladay, special master, who took the testimony, heard arguments, and filed an elaborate report. It appears that after the contract of August 15, 1903, was made, Lane Bros. Company proceeded diligently with the work, until stopped by the appointment of the receivers July 16, 1904. The work was to be done under the direction and supervision of the engineer of the power company, who was to make monthly approximate estimates of all work done and materials furnished under the contract, and monthly payments by the terms of the contract were to be made in "current funds." The funds received from the current earnings of the Virginia Passenger & Power Company, and funds derived from other sources, were all put together, and payments to Lane Bros. Company and other operating expenses generally were paid out of that fund; the work being charged on the books of the company as "construction work." The claim under consideration was for the month immediately preceding the appointment of the receivers. On July 23, 1904, the receivers filed their petition, earnestly recommending that they be authorized to enter into a contract with Lane Bros. Company for the continuance and completion of this work, with letters from the general manager and chief engineer of the Virginia Passenger & Power Company, setting forth in detail the reasons why the work should be completed, stating, among other things:

That "the Petersburg Steam Plant is a very old one, equipped for the most part with old machinery, that has passed its period of reliable life, that it was liable to be shut down at any moment, from causes beyond the control of those operating the plant, or that could be remedied by ordinary, or even extraordinary, repairs, and that the shutting down or serious disablement of this plant would stop all the cars in Petersburg, throw the town into darkness, and prevent the operation of the Richmond & Petersburg Line, and that there would be a considerable saving in the annual operating expenses after its completion."

And the court thereupon entered an order authorizing the contract for the completion of this work, recognizing that it was "to the best interest of the property that a contract should be immediately entered into." The character of this work is set forth in the report of the special master, an uncommonly able and careful lawyer, as follows:

"That the work of widening and deepening the upper Appomattox Canal was essentially necessary to enable the Virginia Passenger & Power Company to operate its railway lines as a continuing business; that the latter company would have failed in its duty (a) to the public, (b) its mortgagees, and (c) its stockholders, if it had neglected to make the improvements contemplated in

its contract of August 15, 1903, with Lane Bros. Company; that said indebtedness of the Virginia Passenger & Power Company to Lane Bros. Company constituted a part of the necessary current operating expenses of the Virginia Passenger & Power Company as a transportation company which should have been paid out of its current receipts; that Lane Bros. Company are entitled to an equitable lien upon the income and revenue of the Virginia Passenger & Power Company, superior to all mortgages, to the full extent of their said claim; that said income and revenue subsequent to July 16, 1904, when a receiver was appointed, have been more than sufficient to pay all current operating expenses and said indebtedness."

The special master further reported that Lane Bros. Company was entitled to a mechanic's lien under the statutes of the state of Virginia. The court, upon hearing the exceptions to the report, held that the petitioners are entitled to an equitable lien to the amount of their debt, payable out of the income derived from the operation of the property over and above current expenses, and superior to all mortgage indebtedness existing against the same; the income and revenue from the operation of the property since the appointment of the receivers being largely more than sufficient to pay the expenses incident thereto. Having reached this conclusion, it did not consider it necessary to pass upon the validity of the mechanic's lien reported in favor of the petitioners. In its opinion the court says:

"The actual service performed by the petitioners in digging the canal, as well as the supplies charged for in connection therewith, for which the claim is made, was something necessary in furtherance of the more effective and economical operation of the existing plant owned and operated by the defendants as a public service corporation, and a useful improvement thereof. No new or independent electric light or power plant was established or railway constructed, but the defendant in its business of the operation of its lines of street railway, and in furnishing light and power to the city of Petersburg and the surrounding country, found it could do the work more effectively and economically by enlarging, improving, and increasing its plant, and, having concluded so to do, the petitioners were employed and engaged on the work at the time of the appointment of the receivers herein, and they now ask payment for labor and materials furnished within 30 days of the receivership. The court's receivers, when appointed, employed the petitioners to complete the work then unfinished, paying them for what was done for the receivers, and subsequently, after further work in the same, proceeded to use the canal and the same has since that time and is now being so used, operated, and conducted by the receivers of the court in this cause in furnishing light and power necessary in the conduct of its business."

A decree for $18,747.59, with interest thereon from July 16, 1904, was thereupon entered, payable out of the income and revenue arising from the operation of the Virginia Passenger & Power Company since the appointment of the receivers, and the same was declared to be an equitable lien superior to all mortgage indebtedness; this being the amount due for work done and materials supplied during the month immediately anterior to the appointment of the receivers. The total amount payable under the contract with Lane Bros. Company on account of this work was something over $200,000. The mortgage indebtedness consisted of two mortgages, one for $15,000,000, and one for $1,000,000.

The question made by this appeal is whether indebtedness incurred in the circumstances stated falls within the exceptional class in which

preferential payments may be allowed, for it is the exception, and not the rule, that priority of liens secured by mortgage can be displaced. The courts have laid down no inflexible rule that governs in all cases, but, beginning with Fosdick v. Schall, 99 U. S. 235, 25 L. Ed. 339, the Supreme Court has in numerous cases stated the governing principle. Many of these cases are reviewed in Southern Railway v. Carnegie Steel Company, 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458, and Gregg v. Met. Trust Co., 197 U. S. 183, 25 Sup. Ct. 415, 49 L. Ed. 717, is one of the last that has been brought to our attention. The principle seems to be this: That every railroad mortgagee, in accepting his security, impliedly agrees that the current debts made in the ordinary course of business shall be paid from the current receipts before he has any claim on the income; that the income out of which he is entitled to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. In a certain limited class of cases such preferential payments have been allowed out of the corpus, but these cases need not be considered, as here the income from current receipts is more than ample for the payment of this claim. One of the foundations of the principle is that the public interest requires that a railroad must be kept a "going concern." It does not depend, therefore, upon the diversion, or even upon the existence of income. No definite period of time within which such preferential claims may accrue has been fixed; but, recognizing that there must be some limitation, a period of six months before the appointment of the receivers has been generally accepted as reasonable. This differentiates this case from that considered by the court in Lackawanna Co. v. Farmers' Loan Co., 176 U. S. 298, 20 Sup. Ct. 363, 40 L. Ed. 475, delivered at the same term at which the Carnegie Case was decided, upon which case the appellants lay much stress. In the Lackawanna Case there was an unusually large purchase of rails, which had been delivered long before the railroad company had made any default in the payment of interest, about 16 months before the company's property was put into the hands of a receiver, and about five and a half years before the appointment of the receiver in that cause. Then, as says the court:

"There is the circumstance that the Lackawanna Company, during the negotiations resulting in the execution of renewal notes, under the second contract for rails, demanded and received collateral security to a large amount from the railroad company; the circumstance tending to show that it did not regard itself as entitled to an equitable claim upon the net earnings in preference to mortgage creditors, but relied upon the general credit of the railroad company."

The contract with the Lane Bros. Company was that the monthly installments were to be paid in "current funds," and payments were actually made as a part of the operating expenses, out of a fund derived in part from current earnings, and in part from other sources. As a matter of bookkeeping, payments made on this account were charged to construction account, and appellants contend that work for new construction does not fall within the principle above stated, that preferential payments are allowed on account of operating expenses,

citing Hale v. Frost, 99 U. S. 389, 25 L. Ed. 419. That case was decided at the same term with Fosdick v. Schall; the Chief Justice, who delivered the opinion in the leading case, announcing in a short opinion that it is governed by Fosdick v. Schall. Hale & Co. had two accounts, one for supplies for the machinery department, and one for material for construction purposes. As to the first, preferential payment was allowed; as to the second, the court says:

"There is nothing in the case to show any special equities in their favor in respect to that part of their account which is for material for construction purposes."

The precise nature of this account is not stated in the report of the case. It may have been proper for the company, as a matter of bookkeeping, to charge this improvement to construction account, but it is plain that the indebtedness incurred was for the permanent improvement of the mortgaged property. It was not a new construction in the sense that the building of a new railroad, or the building of a new plant, would be, but was, as said by the judge below, "something necessary in furtherance of the more effective and economical operation of the existing plant." The precise nature, character, and object of the work appears from the report of the receivers, and the testimony of the general manager. The receivers recommended its completion as "absolutely essential." The general manager reported that:

"The steam plant at Petersburg was liable to be shut down at any moment from causes beyond the control of those operating the plant, or that could be remedied by ordinary or even extraordinary repairs, and that the shutting down or serious disablement of that plant would stop all the cars in Petersburg, throw the town in darkness, and prevent the operation of the Richmond & Petersburg Line."

That the receivers and the general manager of the company considered that the completion of the work upon the canal was absolutely essential to keeping the company a "going concern" is evidenced by their acts, and that the court which had the responsibility of protecting the property and its bondholders was impressed by its necessity is shown by its orders, among the first entered after the appointment of the receivers. If that be so, how can it be justly claimed that the work done by the petitioners during the month immediately preceding the appointment of the receivers was not of equal necessity? No question was made as to the propriety and legality of the orders of the court made after the appointment of the receivers, directing the continuance of this work, and providing for payment for the same out of the current earnings, and for the issue of receivers' certificates, and it appears from the testimony that Mr. Gould, who was the chief owner and controlled the bonds and stock of the Virginia Passenger & Power Company, assented to the same and became the purchaser of the receivers' certificates issued therefor.

The Supreme Court, in affirming the judgment of this court in the Carnegie Case, supra, allowing a preferential lien for rails purchased shortly before the receivership, referring to the circumstance that the court, after the appointment of the receivers, directed the purchase of additional rails, uses this language:

"It is apparent that the purchase of new steel rails while the railroads were in possession of receivers were made in the ordinary course of business, and were properly chargeable upon and payable out of current receipts in preference to the claims of mortgage creditors. In every substantial sense the expenses thus incurred were operating expenses. They were incurred in the interest of mortgage creditors. * * * Why should a different rule be applied to the contracts made with the Carnegie Company shortly before the appointment of receivers in the Clyde suit; the original contract being for only 2,500 tons and the last for only 1,656 tons? Is it to be said that the contract for 2,000 tons of steel rails and the contract for 2,500 tons made by the receivers in the foreclosure suit created debts of a preferential character, while contracts made by the railroad company of exactly the same kind shortly before the appointment of receivers for 2,500 and 1,656 tons of steel rails could not under any circumstances become a preferential debt chargeable upon the current receipts? * * * It is evident that the Carnegie rails purchased shortly before the receivers in the Clyde suit were appointed—the rails here in question—were obtained for the same reason that induced the subsequent purchases by the receivers. No one will say that the use of these rails did not add directly to the value of these securities of mortgage creditors. Within the reason of the rule adverted to, the debts contracted with the Carnegie Company were as much current debts in the ordinary course of the business of the railroad company as were the debts contracted by the receivers under the order of the court when they purchased new rails to put the road in a safe condition. * * * Is it to be said that such expenses incurred by the receivers were preferential debts, but that debts incurred by the railroad company shortly prior to the receivership for rails needed to keep its road in a safe condition for use are not of that class?"

The testimony shows that the payments made to Lane Bros. Company up to the time of the appointment of the receivers were made as ordinary operating expenses, and there are no circumstances tending to show that the intervening petitioners relied upon the general credit of the Virginia Passenger & Power Company, or took any other security, or had any other expectation than that they were to be paid out of the current receipts.

The judgment of the court below is affirmed.