**GUARANTY TRUST CO. OF NEW YORK et al. v. SEABOARD AIR LINE RY. CO.
et al.**

Nos. 213, 214, 228, 229.

District Court, E. D. Virginia.
Sept. 10, 1935.

Edward Duffy and Carlyle Barton, both of Baltimore, Md., Theodore S. Garnett, of Norfolk, Va., for Continental Trust Company, trustee.

Humes, Buck, Smith & Stowell, of New York City (Baird, White & Lanning, of Norfolk, Va., on the brief), for New York Trust Co. and others, trustees.

Davis, Polk, Wardwell, Gardiner & Reed, of New York City (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for Guaranty Trust Co. of New York and others, trustees.

Carl H. Richmond, W. G. Brantley, and W. G. Brantley, Jr., all of Washington, D. C., David & Fainman, Chapman & Cutler, and Frederick W. Flott, all of Chicago, Ill., Ben C. Dey, George L. Buland, Charles L. Minor, and Kellog, Emery & Inness-Brown, all of New York City, and Vandeventer, Eggleston & Black, William P. Boehmer, Asst. U. S. Atty., T. H. Willcox, and John W. Oast, Jr., all of Norfolk, Va., for various claimants.

W. R. C. Cocke and B. P. Holland, Jr., both of Norfolk, Va., and Harold J. Gallagher, of New York City, for receivers of Seaboard Air Line Ry. Co.

WAY, District Judge.

These cases have been heard on exceptions of claimants, National Car Company, General American Tank Car Corporation, Union Refrigerator Transit Company, Standard Transit Company, Quaker City Tank Line, Liquids Despatch Line, Inc., Fruit Growers Express Company, Western Fruit Express Company, Burlington Refrigerator Express Company, Pacific Fruit Express Company, Southern Agricultural Tank Lines, Swift & Co., Mexican Petroleum Corporation, and Arms-Yaeger Railway Car Company, to report No. 24 of the special master, holding that car mileage and car per diem debts are not entitled to priority.

The court referred to the special master all claims against the railway which arose prior to the receivership, and for which priority is sought. Among the matters included in the reference are the claims of the above-named owners of tank, refrigerator, express, and other special cars for rentals all of which accrued within six months immediately preceding the appointment of receivers.

The evidence and the master's report show that it is the general practice of railroads throughout the country to rent from private owners, rather than own, the special equipment used in the transportation of classes of freight such as oils, meats, and perishable products requiring special treatment. This practice has the approval of the Interstate Commerce Commission, and the rates of compensation paid by the railroad to the private car owners for the use of such equipment are in accordance with published tariffs on file with the Commission. It is to be noted also that the law imposed upon railroads the duty to furnish safe and adequate car service which term expressly includes "special types of equipment." Interstate Commerce Act, USCA, title 49, subsections 10 and 11 of section 1.[1]

The advantages and saving to the railroad derived from this practice of transient and occasional hiring of special cars are due in large measure to the fact that the movements of some commodities, particularly fruits and vegetables, requiring special types of cars are largely seasonal in each territory so that it is decidedly more economical for a railroad to rent such special equipment when and as needed, since it thereby avoids having the equipment idle for substantial parts of the year. Under this practice an adequate supply of cars is available to meet the seasonal and occasional demands in each territory served by a railroad, which would hardly be the case if each railroad undertook to own the special equipment necessary for it to meet the demands, usual and unusual.

Under existing arrangements, the special cars are moved from place to place throughout the country as needed. The railroad in all the instant cases except one pays rental based on the mileage that the car actually rolls over its lines. The car ordinarily is turned over to the railroad not for any particular period but for a particular trip. Another advantage of this practice is that it saves the railroad making very substantial outlays for cars. The evidence shows that the Seaboard executives after studies of the problem concluded to save the risks and costs incident to ownership of refrigerator cars by renting them from car owners as occasion might require, and there can be little, if any, real doubt under the evidence that for the Seaboard to have undertaken to own the necessary special equipment to carry the special classes of freight would have driven it out of the perishable and special freight business, since the cost of owning such cars in the necessary numbers would have required the railroad to charge prohibitive rates that would have driven away all that business.

The assistant freight traffic manager of the Seaboard testified before the master that he had been connected with the Seaboard many years and was thoroughly familiar with that railroad's freight traffic; that the use of refrigerator cars was necessary in the transportation of perishable fruits and vegetables; and that this traffic was very important to the railway, producing from a revenue standpoint approximately 25 per cent. of its total revenue. This witness testified further that throughout his entire connection with the Seaboard, covering many years, that railroad had been using refrigerator cars which it did not own, under arrangements substantially similar to the arrangements in existence with Fruit Growers Express Company immediately prior to the receivership. It was shown also that this practice is and has for many years been followed not only by the Seaboard but by all railroads serv-

---

[1] "(10) 'Car service' defined. The term 'car service' in this chapter shall include the use, control, supply, movement, distribution, exchange, interchange, and return of locomotives, cars, and other vehicles used in the transportation of property, including special types of equipment, and the supply of trains, by any carrier by railroad subject to this chapter.

"(11) Duty to furnish car service; rules and regulations. It shall be the duty of every carrier by railroad subject to this chapter to furnish safe and adequate car service and to establish, observe, and enforce just and reasonable rules, regulations, and practices with respect to car service; and every unjust and unreasonable rule, regulation, and practice with respect to car service is prohibited and declared to be unlawful."

ing the same territory, and that it would undoubtedly be most uneconomical and im-, practicable for the railway to attempt to own the necessary cars of that type.

It appears from the master's report that there are three different kinds of *mileage* arrangements which are made for the use of special equipment by railroads generally, namely:

1. In some instances the cars are owned by car companies, which are in the business of owning and leasing cars to shippers. In these instances the railway has nothing to do with the arrangements which are made between the owner and the shipper. The cars are loaded by the shipper and delivered loaded to the railroad, which collects the full freight charges for transporting the commodities. Claims of this character are asserted herein by the following car owners: National Car Company, General American Tank Car Corporation, Union Refrigerator Transit Company, Standard Transit Company, Quaker City Tank Line, and the Liquids Despatch Line.

2. Other car owners furnish cars at the request of the railway; that is, the railway notifies the car owner that a specified number of cars will be needed at certain points to move special freight, and the cars are delivered to the railway by the car owner. In such instances the railway places the cars and moves them when loaded, charging the shipper the full freight, and paying to the car owner the amount stipulated by the tariff for each mile the car moves while loaded. Claims of this class involved are those of Fruit Growers Express Company, Western Fruit Express Company, Burlington Refrigerator Express Company, and Pacific Fruit Express Company.

3. Some cars are owned by shippers, who load their cars and deliver them loaded to the railway. The railway collects full freight charges, usually at destination, and pursuant to the published tariff pays to the owner-shipper the amount stipulated by the tariff for each mile the cars move over its line while loaded. Claims of this character are asserted by Southern Agricultural Tank Lines, Swift & Co., and Mexican Petroleum Corporation.

Under each of the methods enumerated under 1, 2, and 3, above, payment of car mileage rentals accruing to the car owner are usually made on the 10th of the second month following the month in which the rentals accrued. For instance, the Sea-

board was placed in the hands of receivers on December 23, 1930. Had there been no receivership, in the ordinary and usual course the car company would have received payment for the rentals accruing in November, 1930, on or about January 10, 1931. The delay in payment was occasioned by the necessary auditing of the account, not by an extension of credit to the railroad. In other words, the bills for car rentals were paid currently out of the current receipts of the railway, and so far as that phase of the case is concerned, there can be no real doubt that the car companies expected payment and the railway intended to and prior to the receivership, ordinarily did pay these bills regularly out of current receipts, a practice of long standing.

The Pacific Fruit Express Company, one of the claimants, furnished its cars, claim for the use of which is here made, to the Southern Pacific and other railroads operating in Pacific Coast territory to carry shipments of fruits originating on their lines, to territory served by the Seaboard. It appears that in such instances the entire freight was collected by the Seaboard at destination. Likewise a great percentage of the shipments in refrigerator cars originating on the Seaboard are turned over by the Seaboard at the end of its lines to other railroads which transport the shipments to destination, where they collect the entire charges which are later in regular course distributed to those entitled thereto, including the refrigerator car owner. In the Interstate Commerce Commission's report in Atlantic Coast Line R. Co. et al. v. Arcade & Attica R. Corp. et al. (The Citrus Fruit Rates Divisions Case) 194 I. C. C. 729 et seq., the methods of handling citrus fruits and other perishables from the Florida territory are set forth. In a similar manner, also, tank and other special cars roll over two or more railroads and the charges are ordinarily handled in the same way, the final carrier collecting all charges at destination.

Counsel for the Pacific Fruit Express Company in their brief employ this illustration: If a shipper at a point in California should ship a carload of farm implements and a carload of grapes to consignees in Jacksonville, Fla., the farm implements being loaded in an ordinary box car belonging to the Southern Pacific and the grapes in a refrigerator car belonging

to Pacific Fruit Express Company, such shipment would pass over two or more railroads before reaching destination. Each railroad over whose lines these cars passed would become liable, in the case of the box car to the Southern Pacific Railroad at the rate of $1 per day for each day the box car remained on its lines, and to the Pacific Fruit Express Company at the rate of 2 cents per mile for each mile the refrigerator car rolled over its lines. The charges for the box car are fixed by the Code of Per Diem Rules of the American Railway Association, while the charges for the refrigerator cars are fixed by tariffs filed with the Interstate Commerce Commission. All charges on each shipment would be collected by the Seaboard at destination, and distributed to those entitled thereto in the same manner in each instance.

In fact, the railroads handle and interchange privately owned refrigerator and tank cars in substantially the same manner that they do ordinary cars owned by railroads so that there is no apparent distinction between car per diem and mileage debts due other railroads and those due private special car owners.

4. The claim of the Arms-Yaeger Car Company, which was also disposed of in the special master's report No. 24, *is not a car mileage claim*. In that case, the car company leased to the railway company *fifty express cars* at a rental of $6.50 per day. The cars so leased were placed in the regular service of the railway company. The compensation to be paid by the railway company was not covered by tariffs, or approved by the Interstate Commerce Commission. The testimony shows that at the time these cars were leased they were badly needed by the railway company. They were used by the receivers for the first four months of the receivership, and then returned to the claimant, but the rental accruing during use by the receivers is not involved in this controversy. The contract of lease is dated June 10, 1930, and was to run for a period of ninety days and thereafter until the expiration of thirty days' written notice by either party of the intention to terminate it. It contained no provision to the effect that upon default in the payment of the rental the cars could be retaken or recaptured by the lessor. The evidence with respect to this claim shows that the Arms-Yaeger Car Company first began to lease

express cars to the Seaboard in April, 1921; that this type of car is expensive, is not readily obtainable, and usually requires a year or so to construct; that the demands of the railroad for such cars were not regular but varied considerably and were somewhat occasional; and that the number of express cars leased to the Seaboard from 1921 to the appointment of receivers in December, 1930, averaged about 56. It was further shown that the practice was to send the bills for rental the last of the month in which it was earned and that the bills were usually paid around the 25th of the month in which they were sent, although in some instances they were suffered to run for much longer periods.

The evidence, I think, fails to show that such leasing was extraordinary or unusual for a railroad as large as the Seaboard. As already stated, no security was received, accepted, or demanded by the Arms-Yaeger Car Company, and the fair inference would seem to be that the car company and the railroad contemplated that the bills would be paid out of current receipts just as in the case of car mileage claims. The charge made for the cars was the American Railway Association per diem rate of $6.50 per car per day.

The sole question presented by the numerous exceptions of claimants to the special master's report is: Did the special master err in denying priority to these claims all of which accrued within the six months immediately preceding the appointment of receivers? As the special master has in effect found and the evidence clearly shows that the service or use of the supply furnished by claimants was essential, and was expected to be paid for out of current receipts as an ordinary current expense, the only question remaining for decision on the exceptions would appear to be: Does the supplying of special cars for the transportation of classes of freight requiring special treatment, under the circumstances shown, constitute a supply or service entitled to priority?

Counsel for the mortgage trustees rely upon the following decisions to sustain the report:

Mather, etc., Stock Transp. Co. v. Anderson (C. C. A. 7, 1896) 76 F. 164. It appears that the car company leased to the railroad 100 stock cars, and that the rental for which priority was sought accrued before the appointment of receivers.

It further appears inferentially at least from the opinion that the car company had reserved the right to repossess upon default in the payment of rent, and if I correctly interpret the brief on behalf of the mortgage trustees, it is conceded that the car company in the Mather Case had reserved that right.

Rodger Ballast Car Co. v. Omaha, etc., Railroad Co. (C. C. A. 8, 1907) 154 F. 629. The claim in that case alleged to be entitled to priority, represented the purchase price of 32 ballast cars and one plow car bought by the railroad within six months prior to receivership. With respect to the claim the court said ([C. C. A.] 154 F. 629, 633): "A current expense incurred in the ordinary course of business within six months prior to a receivership is a usual expense incurred in the customary course of the business of the company. The evidence in this case fails to convince that the purchase of these 33 cars for $26,192.05 by a railroad company operating 168 miles of railroad was the incurring of such an expense. There was no evidence that the company had ever bought such a lot of cars before, or that in the ordinary course of its business it was accustomed to purchase such a lot once in three months or in six months or in any specific number of months, as a part of the current expenses of its operation. On the other hand, the record demonstrates the facts that the expense of this purchase was not a current or a customary, but an unusual expense, that it was not incurred in the ordinary course of the business of the company, but on an extraordinary occasion to answer an unprecedented demand and to provide for an unparralleled situation. For this reason, the debt of the railroad company to the appellant for these cars lacks an indispensable element of a preferential claim, and there was no error in the dismissal of the petition." The court also based its decision in the Rodger Ballast Case upon the further ground that the purchase price or rental of engines and cars are not entitled to preferential payment, and quoted the Thomas Case (Thomas v. Western Car Co.), 149 U. S. 95, 13 S. Ct. 824, 37 L. Ed. 663, as authority.

Gregg v. Mercantile Trust Co. (C. C. A. 6, 1901) 109 F. 220. That case held that a debt incurred by a railroad company representing the purchase price of locomotives acquired to give the railroad additional motive power was not one entitled to preference over mortgage debts.

Rhode Island Locomotive Works v. Continental Trust Co. (C. C. A. 6, 1900) 108 F. 5. There the claimant sold to the railroad company 12 locomotives through a third party who paid 80 per cent. of the purchase price and took title, and then transferred the locomotives to the railroad company under a lease contract. The lease payments ran for a period of 72 months. For the remaining 20 per cent. of the purchase price the claimant took a series of notes of the railroad company also extending over a period of months. It did not appear that the engines were necessary to maintain the road as a going concern or to its safe operation, but that they were needed to enlarge its capacity to handle traffic. It further appeared from the master's report that the lessor reserved the right to repossess the engines upon default. The court held that such facts were insufficient to establish the debt as a necessary current expense, or that it was contracted in reliance on its payment from current earnings.

Pullman's Palace-Car Co. v. American Loan & Trust Co. (C. C. A. 8, 1897) 84 F. 18, 23. The Pullman Company's claim was for car mileage arising under a contract between it and the railroad containing many provisions with respect to the undertaking to furnish sleeping and parlor cars for use on the railroad. Among other things, the contract provided that the Pullman Company should have the exclusive right for a term of fifteen years to furnish sleeping and parlor cars for the use of the railroad on all its lines and trains. The contract also contained a provision authorizing the car company to terminate the contract upon default in payment of the rental. The court in a per curiam opinion denied the claim priority, saying: "Notwithstanding the ingenious and able argument of counsel for appellant, we are unable to perceive in this case other than an effort to establish as a preferential debt a claim for the stipulated compensation for the use of cars, or, as it is generally called, 'car rental.' Under the authority of Thomas v. Western Car Co., 149 U. S. 95, 13 S. Ct. 824 [37 L. Ed. 663], this cannot be done. The order is therefore affirmed."

Grand Trunk Ry. Co. v. Central Vermont R. Co. (Cir. Ct. Vt., 1898) 90 F. 163. The opinion does not disclose any of the facts other than that the claim was for car rentals or mileage accruing prior to the receivership. The decision followed

the Thomas Case (Thomas v. Western Car Co.), 149 U. S. 95, 13 S. Ct. 824, 37 L. Ed. 663, and the Pullman's Palace-Car Case (C. C. A.) 84 F. 18, and held squarely that a claim for car rental or mileage was not entitled to priority.

In Fosdick v. Schall (1878) 99 U. S. 235, 25 L. Ed. 339, the railroad entered into a contract with the car owner whereby the latter agreed to sell and deliver to the railroad at a price payable in installments a number of cars, which, until they should be paid for, were to remain the seller's property. When delivered the cars were lettered and marked as the seller's property, and were thereafter used in the ordinary business of the railroad. During the progress of a receivership which followed, the car owner filed a petition praying: (1) That car rental which accrued prior to the appointment of receivers be accorded priority, (2) that he be paid rental for the use of the cars by the receivers, and (3) for the return of the cars.

The court refused to accord priority to the claim for rent of the cars which accrued prior to the receivership, but held that payment of rent for the time the cars were used by the receivers was proper and also upheld the lessor's right to reclamation and decreed that the cars be· returned to him.

Kneeland v. American Loan & Trust Co. (1890) 136 U. S. 89, 10 S. Ct. 950, 34 L. Ed. 379, and Thomas v. Western Car Company (1893) 149 U. S. 95, 13 S. Ct. 824, 37 L. Ed. 663. It will be noted that all of the decisions of Circuit Courts and Circuit Courts of Appeals, hereinabove referred to, follow the decision of the Supreme Court in the Thomas Case. Much has been said in the arguments of counsel with respect to the facts in those cases, especially the Thomas Case; that is, as to whether or not the facts in the instant cases clearly distinguish them from the Kneeland and Thomas Cases. However, the Supreme Court has on two subsequent occasions expressed views with respect to those decisions so that it is not necessary or appropriate here to discuss the contentions of counsel in the instant case on that subject. In Virginia & A. Coal Co. v. Central Railroad & Banking Co., 170 U. S. 355, at page 371, 18 S. Ct. 657, 663, 42 L. Ed. 1068, it is said: "In the Kneeland Case, however, the claim refused priority was based upon an alleged instrument of lease, and was for four months' rental of cars operated on a line of railroad by a receiver appointed at the suit of a judgment creditor, such receiver being succeeded in office by a receiver appointed in the foreclosure proceedings instituted by the trustees of the mortgage bondholders. It was held that the alleged contracts of lease were, in substance and effect, 'antecedent contracts of sale'; that in those contracts ample provision had been made by the vendor for his security by stipulations authorizing a retaking of the property upon failure to make payment promptly of the installments of purchase money as they became due, and that the claim against the fund was in reality for a portion of the purchase price of the cars. Under these circumstances the debt was held not to be embraced 'in the few specified and limited cases' in which this court 'has declared that unsecured claims were entitled to priority over mortgage debts,' and particular attention was called, among other things, to the fact that the receivership at the suit of the judgment creditor was not for the benefit of the mortgage bondholders, so that it could not be asserted that the expenditures of such receivership were payable, in any event, out of the income or corpus of the property; and the fact was also noticed that from the time of the purchase of the rolling stock in question in the suit to the time of the final disposition of the mortgage foreclosure the receipts did not equal the operating expenses, and there had been no diversion of the current earnings, either to the payment of interest or the permanent improvement of the property. In the Thomas Case, claims for rental of cars, which rental had accrued prior to the receivership, were denied priority over the mortgage bonds; but the facts in that case were such as to justify the conclusion that the car company contracted 'upon the responsibility of the railroad company, and not in reliance upon the interposition of a court of equity.'"

In Southern Ry. Co. v. Carnegie Steel Co., 176 U. S. 257, at page 284, 20 S. Ct. 347, 358, 44 L. Ed. 458, the court again referred to the Kneeland and Thomas Cases, saying: "It is apparent from an examination of the above cases that the decision in each one depended upon its special facts. This court has uniformly refrained from laying down any rule as absolutely controlling in every case involving the right of unsecured creditors of a corporation, whose property is in the hands of a receiver, to

have their demands paid out of net earnings in preference to mortgage creditors."

Since all of the decisions of the Circuit and Circuit Courts of Appeals relied on to support the mortgage trustees' contentions follow the Thomas Case, I have dwelt at length on the cases relied on by the mortgage trustees in order to make clear what, after mature consideration, I believe to be controlling distinctions between the facts of the Kneeland and Thomas Cases and the facts of the instant claims.

In recent decisions of our Circuit Court of Appeals in Bowen v. Hockley, et al. (C. C. A. 4) 71 F.(2d) 781, 94 A. L. R. 856, and Continental Trust Co. v. W. R. Bonsal & Co. (C. C. A. 4) 72 F.(2d) 975, certiorari denied in the latter case Id., 293 U. S. 624, 55 S. Ct. 239, 79 L. Ed. 711, many of the decisions on priority claims are reviewed and discussed in the opinions of Judge Parker. In the Bonsal Case (C. C. A.) 72 F.(2d) 975, 977, Judge Parker said: "The principle upon which the six months' rule is based was first laid down by the Supreme Court in Fosdick v. Schall, 99 U. S. 235, 251, 25 L. Ed. 339, where the court said: 'We have no doubt that when a court of chancery is asked by railroad mortgagees to appoint a receiver of railroad property, pending proceedings for foreclosure, the court, in the exercise of a sound judicial discretion, may, as a condition of issuing the necessary order, impose such terms in reference to the payment from the income during the receivership of outstanding debts for labor, supplies, equipment, or permanent improvement of the mortgaged property as may, under the circumstances of the particular case, appear to be reasonable. * * * The business of all railroad companies is done to a greater or less extent on credit. This credit is longer or shorter, as the necessities of the case require; and when companies become pecuniarily embarrassed, it frequently happens that debts for labor, supplies, equipment, and improvements are permitted to accumulate, in order that bonded interest may be paid and a disastrous foreclosure postponed, if not altogether avoided. In this way the daily and monthly earnings, which ordinarily should go to pay the daily and monthly expenses, are kept from those to whom in equity they belong, and used to pay the mortgage debt. The income out of which the mortgagee is to be paid is the net income obtained by deducting from the gross earnings what is required for necessary operating and managing expenses, proper equipment, and useful improvements. *Every railroad mortgagee in accepting his security impliedly agrees that the current debts made• in the ordinary course of business shall be paid from the current receipts before he has any claim upon the income.*'" (Italics supplied.) And later in the same opinion [72 F.(2d) 975, page 980]: "We are not to be understood as holding, or as construing Virginia Passenger & Power Co. v. Lane Bros. Co., supra [(C. C. A.) 174 F. 513, certiorari denied 215 U. S. 610, 30 S. Ct. 411, 54 L. Ed. 348], to hold, that a claim is entitled to priority under the six months' rule merely because supplies furnished have been used to improve the property and have added to the value of the mortgage security. In addition to having been incurred within six months and with the expectation that it should be met out of current receipts, the debt, as was said in the Carnegie Steel Company Case, must be one which is 'fairly to be regarded as part of the operating expenses of the road incurred in the ordinary course of business.'"

In Bowen v. Hockley, supra (C. C. A.) 71 F.(2d) 781, at page 783, 94 A. L. R. 856, Judge Parker said with respect to the matter there under consideration:

"The situation is closely analogous to that presented in the line of cases involving claims against railroad receivers for labor and supplies furnished railroads prior to receivership, which have enabled the business to be carried on and have been furnished with the expectation that they would be paid for out of current earnings. The leading case on the subject is Fosdick v. Schall, 99 U. S. 235, 253, 25 L. Ed. 339, the doctrine of which was applied in Hale v. Frost, 99 U. S. 389, 25 L. Ed. 419, as authority for paying from current earnings of the road while in receivership claims for supplies furnished it prior thereto. The controlling principle was thus stated in Fosdick v. Schall:

"'The mortgagee has his strict rights which he may enforce in the ordinary way. If he asks no favors, he need grant none. But if he calls upon a court of chancery to put forth its extraordinary powers and grant him purely equitable relief, he may with propriety be required to submit to the operation of a rule which always applies in such cases, and do equity in order

to get equity. The appointment of a receiver is not a matter of strict right. Such an application always calls for the exercise of judicial discretion; and the Chancellor should so mould his order that while favoring one, injustice is not done to another. If this cannot be accomplished, the application should ordinarily be denied.'"

And in 71 F.(2d) 783, at pages 784, and 786, of the same opinion, 94 A. L. R. 856:

"We do not mean to say that the decisions applying what has come to be known as the 'six months' rule' constitute controlling authority on the question before us. We cite them as illustration of how the maxim, 'he who seeks equity must do equity,' has been applied by the courts to protect the rights of those who have made contribution to the carrying on of a business with expectation that they were to be paid from current earnings, where the courts have been called upon to carry on the business so as to preserve it for the benefit of its creditors. It is true that in the case of railroads the public has an interest in their continued operation, but so also have the creditors; and it is because these have asked the exertion of the extraordinary power of equity to continue the operation of the business, and because the court is operating it for their protection, that the court has laid down the rule that the receivers must pay what would be treated as current expense of operation if the business were left to be operated by its owner. It is worthy of note that this rule was established nearly half a century ago by courts of equity without the aid of statute, and that Congress has recently approved it in the recent amendment to the Bankruptcy Act (section 77 (c), 47 Stat. 1477, 11 USCA § 205 (c). And see 'The Present Status of the Six Months Rule' by Thomas O'Gorman FitzGibbon, XXXIV Columbia Law Review, 230." 71 F.(2d) 783, page 784.

"One of the glories of equity jurisprudence is that it is not bound by the strict rules of the common law, but can mold its decrees to do justice amid all the vicissitudes and intricacies of life. The principles upon which· it proceeds are eternal; but their application in a changing world will necessarily change to meet changed situations. If relief had been granted only where precedent could be found for it, this great system would never have been developed; and, if such a narrow view of equitable powers is adopted now, the result will be the return of the rigid and unyielding system which equity jurisprudence was designed to remedy." 71 F.(2d) 783, page 786.

In New York Dock Co. v. S. S. Poznan (1927), an admiralty cause, 274 U. S. 117, at page 121, 47 S. Ct. 482, 484, 71 L. Ed. 955, Mr. Justice Stone, after referring to numerous decisions relating to the "six months' rule," said: "Such preferential payments are mere incidents to the judicial administration of a fund. They are not to be explained in terms of equitable liens in the technical sense, as is the case with agreements that particular property shall be applied as security for the satisfaction of particular obligations or vendors' liens and the like, which are enforced by plenary suits in equity. They result rather from the self-imposed duty of the court, in the exercise of its accustomed jurisdiction, to require that expenses which have contributed *either to the preservation or creation* of the fund in its custody shall be paid before a general distribution among those entitled to receive it." (Italics supplied.)

The order entered in this cause by Judge Groner appointing receivers expressly authorized the receivers to pay, among others, claims for "car mileage" and "car per diem." That part of the order reads: "(d) The following claims incurred by the Railway Company *within six months* preceding the date of this order, to-wit: wages, salaries, fees and other charges for services rendered the Railway Company in the usual and customary operation of its properties and the conduct of its current business, unpaid material and supply accounts incurred in the operation of said properties, unpaid and outstanding pay checks and wage checks representing labor actually performed for the Railway Company, and unpaid ticket, traffic, *car mileage and car per diem* balances and accounts for car equipment and repairs." Printed Rec. pp. 53, 54.

An identical provision was incorporated by this court in the order entered in 1932, appointing receivers of the Norfolk Southern Railroad Company, and counsel for claimants have cited many other instances[2]

---

[2] S. D. Florida; S. D. Georgia; E. D. Missouri in several instances; S. D. N. Y. numerous instances; S. D. Alabama; D. of Vermont; E. D. Arkansas; D. of Nevada; D. of Utah, two cases; D. of Minnesota; N. D. of Illinois.

in which District Courts throughout the country have in the last few years, in orders appointing receivers, authorized the receivers to pay car mileage and car per diem claims which had accrued within the six months immediately preceding the appointment of receivers, along with other claims similar to those specified in Judge Groner's order above quoted. And, so far as I am now able to ascertain, the payment of car mileage and car per diem claims by receivers has been seriously questioned in only one case prior to this, namely, in Guaranty Trust Co. v. Minneapolis & St. L. R. Co. In the opinion (not reported) deciding the question, Circuit Judge Booth said:

"The character of the claims is stated by the Special Master as follows:

" 'That said claims cover charges for car repairs, car mileage and per diems, and services rendered in transferring passengers and baggage at transfer and junction points. That said car mileage, rentals and per diems accrued through the occasional and transient use of cars of connecting carriers and private car lines loaded with freight passing to and from connecting lines and ordinarily carrying a particular product or especially fitted for the transportation of an unusual class of freight. That the collection and use of such transient equipment was authorized under special tariff sheets duly approved by the Interstate Commerce Commission, and that under such authority the shipper paid to the carrier an amount which included not only the carriers freight charges, but also an additional sum sufficient to liquidate the car mileage or per diems charged, which form the basis of the claims now considered, and which was due to the owner of the car as his compensation for the use of such equipment. That the carrier collected such additional sum for and on behalf of the owner for transmittal to him in due course of business.'

"In the memorandum order filed recently in this cause in connection with the Albia Coal Company group of claims, certain tests, gathered or deduced from the controlling authorities, were stated for determining whether a claim is entitled to a preferential status. They are repeated here:

" '1. That the consideration for the claim was a current expense of ordinary operation of the railroad, necessarily incurred to keep it a going concern.

" '2. That the claim represents a debt contracted with the expectation or intention of the parties that it was to be paid out of the current earnings of the railroad.

" '3. That the claim shall have accrued within six months prior to the appointment of the receiver.'

"In my judgment, the evidence relative to the claims now being considered, shows that all three of the tests are met. The objectors cite the following cases: Kneeland v. American L. & T. Co., 136 U. S. 89, 10 S. Ct. 950, 34 L. Ed. 379; Thomas v. Western Car Co., 149 U. S. 95, 13 S. Ct. 824, 37 L. Ed. 663; Pullman's Pal.-Car Co. v. American L. & T. Co. (C. C. A.) 84 F. 18; Rodger Ballast Car Co. v. Railroad Co. (C. C. A.) 154 F. 629; Mather Humane Stock Transp. Co. v. Anderson (C. C. A.) 76 F. 164; Grand Trunk Ry. Co. v. Cent. Vt. R. Co. (C. C.) 90 F. 163. In my opinion, no one of these cases is applicable to the facts of the claims now being considered."

An examination of the record in the first Seaboard Air Line Receivership (1908) reveals the fact that the receivers *after* the mortgage trustee had intervened and been made a party, filed report No. 3, in which they said: "The Seaboard Air Line Railway is indebted to various other railway companies, whose lines connect with those of the Seaboard Air Line Railway, on claims for per diem charges on the cars of such connecting lines while on the lines of the Seaboard Air Line Railway—such claims being commonly known as 'Per Diem Claims,' and are necessarily incurred, from time to time, in the operation of the railroad. The Chief Executive Officer has informed the Receivers that of these per diem claims now remaining unpaid, those which accrued prior to June 30th, 1907, amount, approximately, to $5,000.00 in the aggregate; that it takes several months to check up those claims and put them in condition for settlement, and that these unpaid per diem claims, accruing prior to June 30th, 1907, would, but for the Receivership, have been settled early in this month and charged up in the account for December; that it is of the greatest importance that claims of this sort be settled in order to avoid complications with connecting lines, which, in all probability, would refuse to handle Seaboard cars, or promptly settle similar balances due to the Seaboard Air Line Railway, if their own per diem claims should not be settled by

the Railway Company; in short, that it is necessary to settle all of these per diem claims in order to continue the successful operation of the Seaboard Air Line Railway's lines."

The order entered by Judge Pritchard (January 25, 1908), upon report No. 3, provided: "Eighth. That, in pursuance of the seventh recommendation of the Receivers contained in the said last named report, said Receivers be, and they are hereby, authorized and instructed to pay the unpaid 'per diem claims' and ticket balances due by the Seaboard Air Line Railway to various connecting lines, *regardless of whether they accrued prior to June 30th, 1907,* or not, as set forth and recommended in the said report, provided that not exceeding $10,000.00 be used for this purpose without the further order of the court in this cause." (Italics supplied.)

In a prior order entered by Judge Pritchard, appointing the receivers, he had already authorized the receivers "in their discretion to pay and discharge all sums due or to become due other railroads arising from the interchange of business and for track service of other railroads used in the operation of the lines of complainant's railway system, traffic and *car mileage* balances due to other railways and carriers, * * * incurred in the operation of said railroad system since June 30, 1907."

It therefore appears that Judge Pritchard recognized as ordinary operating expenses not only car mileage balances that had accrued within six months, but, in view of the special circumstances reported by the receivers, also authorized the payment of car per diem claims which had accrued more than six months prior to the receivership. A check of the record in the first Norfolk Southern receivership discloses that Judge Waddill in an order entered July 1, 1908, appointing receivers, expressly ordered the receivers "to pay and discharge all such traffic and *car mileage balances* as may become due to connecting or other railroads and all other charges, expenses, and liabilities that may be incurred by the receivers in managing and conducting such business and operating such railways." While the order of Judge Waddill as to traffic and car mileage balances was silent as to prior claims of that class, as well as to supply claims generally, and therefore prospective only, the point is that as early as 1908 *car per diem* and *car mileage* claims had come to be recognized

by the courts as necessary and ordinary railroad operating expenses.

Counsel for claimants cite the following cases in which the payment of ticket, traffic, car mileage balances, *or* similar claims due connecting and other lines were authorized: Miltenberger v. Logansport, C. & S. W. R. Co., 106 U. S. 286, 311, 312, 1 S. Ct. 140, 27 L. Ed. 117; St. Louis, A. & T. H. R. Co. v. C. C. C. & L. R. Co., 125 U. S. 658, 673, 8 S. Ct. 1011, 31 L. Ed. 832; Equitable Trust Co. v. Wabash R. Co. (C. C. A.) 244 F. 66, 71; Central Trust Co. v. Chicago, A. & N. R. Co. (D. C.) 232 F. 936; Finance Co. v. C., etc., R. Co. (C. C. A. 4) 62 F. 205, and Van Frank v. Mo. P. Co., 89 Mo. App. 460.

In Equitable Trust Co. v. Wabash R. Co. (C. C. A. 6, 1916) supra, the order appointing receivers expressly authorized the receivers "to pay * * * all ticket, traffic and *car mileage* balances, *car per diem* and amounts for car and equipment repairs, which are due or may become due to connecting or other railroads." And compare Equitable Trust Co. v. Wabash R. Co., supra, with Rhode Island Locomotive Works v. Continental Trust Co., supra (1900), both decided by the same Circuit Court of Appeals. And in Finance Co. v. Charleston, C. & C. R. Co. (C. C. A. 4, 1894) 62 F. 205, 208, the order appointing receivers expressly authorized the receivers to pay *"all balances due to other carriers and connecting lines* and necessary to be paid for the conducting of said railroad."* Afterwards the receiver was granted authority, without objection, to issue receiver certificates to meet those along with other obligations. The Richmond & Danville Railroad filed a petition seeking the payment of a balance due it for freight from the railroad in receivership. The allowance of priority payment was upheld. When the case was heard on appeal, Chief Justice Fuller presided and wrote the opinion, in which it is said: "It must be regarded as settled that a court of equity may make it a condition of the issue of an order for the appointment of a receiver of a railroad company that certain outstanding debts of the company shall be paid from the income that may be collected by the receiver, or from the proceeds of sale; that preferential payments may be directed of unpaid debts for operating expenses, accrued within 90 days, and of limited amounts due to other and connecting lines of road for materials and repairs and for unpaid ticket

and freight balances, in view of the interests both of the property and of the public, that the property may be preserved and disposed of as a going concern, and the company's public duties discharged; and that such indebtedness may be given priority, notwithstanding there may have been no diversion of income, or that the order for payment was not made at the time, and as a condition, of the receiver's appointment, the necessity and propriety of making it depending upon the facts and circumstances of the particular case, and the character of the claims."

It is urged on behalf of the mortgage trustees that the basis of the six months' rule is that the "supplies" furnished must contribute to maintain the railroad as a going concern, not to make it such; in substance, that the six months' rule assumes the railroad already to be equipped with all cars necessary to conduct its transportation business, and that the service supplied by claimants merely amounts to the railroad's securing cars by another method rather than by purchase or long-term formal leases, but that the controlling principle of law is the same. In the first place this contention overlooks the fact that upkeep and maintenance of the cars are embraced in the mileage or per diem which the railway pays to the private car owner for use of the cars, yet I think no one would seriously contend that if the railway had owned the cars and had them repaired or even rebuilt from time to time in the ordinary and usual course of operations that such costs would not be entitled to priority.

But aside from that consideration, the court is unable to agree that it would be just or equitable in these cases to apply so strict a rule as counsel for the trustees urge. The practice of using privately owned special equipment to transport classes of freight requiring special treatment seems to have developed very largely since the decisions upon which the trustees rely were rendered. An illustration of that fact may be found in the Interstate Commerce Commission's report, previously referred to, 194 I. C. C. 729, at page 743, where it is said: "In 1908, Florida citrus fruit was carried largely in felt-lined ventilated box cars owned by the Florida carriers. Since that time movement in refrigerator cars has increased steadily until it now constitutes about 99 per cent. of the total." It is also apparent from the evidence that, due to the seasonal and occasional demands and use of such special equipment and to the heavy and unprofitable outlay of capital which ownership thereof by the railroads would entail, railroad men, public commissions, financiers, and in fact the shipping public, do not regard ownership by the railroads of such special types of rolling equipment as necessary to make a railroad a going concern, so that the purchase of the use of refrigerator, tank, and other special cars when and as the occasion arises has come in railroad operation to be as current, ordinary, and practically as necessary as the employment of executives, trainmen, clerks, and laborers, and the purchase of coal, ballast, and ties.

This practice of the Seaboard, and of other railroads as well, is so thoroughly established, and has been followed so long, that it is not easy to understand why the mortgage trustees should now seriously question its adoption by the court. For instance, the receivers in this case have, pursuant to the order entered by Judge Groner placing the railroad in receivership, gone right along doing business with the private car owners in the same manner the railroad did prior to receivership. The receivers really had no choice, since the practical necessities of the railroad business as now conducted throughout the country made such course imperative, and the monthly bills of the car owners, undoubtedly with the knowledge and at least implied assent of the mortgage trustees, have been for several years paid in ordinary and usual course by the receivers without objection or question by anyone. It also appears from the record in this cause that the Seaboard mortgages, both system and divisional, were made and recorded from fifteen years to as long as almost fifty years prior to the receivership, the latest mortgage being dated September 1, 1915, while some were executed and recorded in the early eighties. The practice of treating car mileage and car per diem debts as necessary and ordinary operating expenses has, as already observed, been followed by the Seaboard for many years, apparently as far back as the first receivership (1908); yet, so far as the record discloses, not one of the mortgage trustees has heretofore questioned the practice or asserted that debts so incurred were not proper current operating expenses.

It would seem logical to conclude also, in view of the provisions generally contain-

ed in orders appointing receivers of railroads, that the courts have adopted the views of those who operate, finance, and have charge of the regulation of railroads, to the effect that car mileage and car per diem debts are not extraordinary or unusual expenditures, but, on the contrary, are ordinary current expenses, essential to the operation of a railroad, and, as such, entitled to preferential treatment similar to that accorded claims for salaries, coal, ties, replacement rails, and the like. This is the interpretation which appears without exception in actual practice to have been placed upon the decision of the Supreme Court in Thomas v. Western Car Co., supra, namely, that the principle there laid down applied to the special facts of the Thomas Case as stated by the Supreme Court in the Carnegie Steel Company Case, and consequently was never intended to govern cases which differ so radically as do the instant cases from the facts of the Thomas Case.

It is also to be kept in mind that almost the entire structure of the act of Congress to regulate commerce as amended in 1906 (34 Stat. 584–595), and the subsequent amendments thereto, have become law since the decisions upon which the trustees rely; that the provisions of that act, as amended, such as requiring railroads to establish through routes and joint rates and to interchange cars, have, for practical purposes, transformed the railroads of the country into a single-rail transportation system, so that if the courts refuse preferential payment to car mileage and per diem claims, other railroads and the private car owners will have the right to retaliate by refusing the use of their cars to railroads in receivership, a situation that would no doubt seriously tend to interfere with continuity of operation. It would also appear, in the light of the provisions of the Interstate Commerce Act, 49 USCA § 1 et seq., and the decisions of the courts, that a railroad such as the Seaboard, operating as it does over 4,000 miles of road, is to be regarded as an important national highway, continuity in the operation of which must not be broken by a receivership or change in ownership or control; but that in the public interest, as well as in the interest of those who have invested in its securities, it must be operated notwithstanding changes in control or ownership, and it would seem to follow, if operation must be continuous, that continuity in the payment of the usual, ordinary, and necessary operating expenses should be maintained.

The court has been impressed by the fact that counsel for the trustees frequently employ the word "supplies" in their arguments in a somewhat narrow sense. Thus it is stated in their main brief that "in order to be entitled to priority, a claim must be for supplies essentially necessary to enable the road to be operated as a continuing business and must be purchased for use and used in operation, and the claimant must have relied upon current earnings and not upon the personal credit of the company." While the earlier cases possibly may to an extent seem to refer to "supplies" in a somewhat narrow sense, the later decisions seem to give to it a broader and more inclusive interpretation. For example: In New York Dock Co. v. S. S. Poznan, 274 U. S. 117, at page 121, 47 S. Ct. 482, 484, 71 L. Ed. 955, the court refers to claims entitled to priority as *"expenses"* which have "contributed either to the *preservation* or *creation* of the fund" in the court's custody; in the Carnegie Steel Co. Case, 176 U. S. 257, at page 285, 20 S. Ct. 347, 44 L. Ed. 458, and the Lackawanna Case (Lackawanna Coal & Iron Co. v. Farmers' Loan & Trust Co.) 176 U. S. 298, at page 315, 20 S. Ct. 363, 369, 44 L. Ed. 475, such claims are described as *"current debts* of a railroad company contracted in the ordinary course of its business,"* while in the Virginia-Alabama Coal Co. Case, 170 U. S. 355, at page 368, 18 S. Ct. 657, 42 L. Ed. 1068, they are referred to as *"expenditures"* made to enable the road to be operated as a *continuing* business; in the Bonsal Case (C. C. A.) 72 F.(2d) 975, at page 981, the court refers to *"current debts"* made in the ordinary course of business, while in Bowen v. Hockley (C. C. A.) 71 F.(2d) 781, at page 784, 94 A. L. R. 856, it refers to the "rights of those who have made contribution to the carrying on of a business with expectation that they were to be paid from current earnings"; and in the Virginia Passenger & Power Co. Case (C. C. A. 4) 174 F. 513, at page 516, reference is made to *"current debts* made in the ordinary course of business."

In conclusion, I think it is clear that the debts here under consideration represent necessary expenses incurred in the usual and ordinary operation of the railroad in accordance with the long-established practice concurred in, impliedly at least,

by all interested parties; that such debts accrued within the six months immediately preceding the appointment of receivers, and were incurred with the expectation that they would be paid out of the current receipts of the railroad, and, consequently, are entitled to priority. An order in conformity with these conclusions will follow.